407 So.2d 1175 (1981)
STATE of Louisiana
v.
Paul M. KROLOWITZ.
No. 81-KA-0374.
Supreme Court of Louisiana.
November 16, 1981.
Rehearing Denied January 25, 1982.
*1176 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Jack Rowley, Dist. Atty., Glenn Diaz, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Ronald S. Ruiz, New Orleans, for defendant-appellant.
*1177 WATKINS, Justice Ad Hoc.[*]
Defendant, Paul M. Krolowitz, has appealed from a conviction for armed robbery (a violation of LSA-R.S. 14:64). He was tried before a jury and sentenced to fifty years hard labor without benefit of parole, probation, or suspension of sentence. We affirm the conviction and sentence.
On March 26, 1979, at 6:30 a. m. two armed men (one found to be Paul M. Krolowitz) entered a food store owned by Dennis Acosta in St. Bernard Parish, robbed him of approximately $43.00 and fled. In carrying out the robbery, the men beat Acosta with a pistol, stepped on his leg, and shot him in the knee with a Smith & Wesson.357 magnum revolver which one of them was carrying. Two bullet fragments were found in Acosta's leg after he was discovered at the store and received medical attention. Acosta died of his injuries some weeks later. A pistol identified by ballistics experts as having fired the bullet, the fragments of which were removed from Acosta's leg, was found in Krolowitz's trailer in the execution of a search warrant. Krolowitz was tried for armed robbery, not murder, in the case now before us on appeal.

ASSIGNMENT OF ERROR NO. 1
Defendant contends that the search warrant in the execution of which the Smith & Wesson revolver was seized was granted under an improper affidavit.
The following facts underlie the issuance of the affidavit. On the night of May 2, 1979, law enforcement officers in St. Bernard Parish were called to a trailer park in which pistol shots had been fired. When they arrived at the scene, certain law enforcement officers saw one Juanita Tyson run out of a trailer owned by Krolowitz and drop certain objects under the trailer. These objects were found to be narcotic drugs and narcotics paraphernalia. Miss Tyson was arrested and after having been arrested told the law enforcement officers that the pistol that had been fired was in "the" (meaning Krolowitz's) trailer.
Upon the issuance and execution of the affidavit, a Smith & Wesson .357 magnum pistol was found hidden in the trailer. A motion to suppress evidence (the pistol) was filed by Krolowitz together with a motion not here pertinent, and after hearing, the motion to suppress evidence was denied. The lower court's action on this motion was sought to be brought before us by application for writs, which were denied. (See No. 67,173, April 8, 1980).
When the state attempted to introduce the revolver in the trial for armed robbery, the defense objected, the objection was overruled, and the revolver was introduced. To this introduction the present bill of exceptions was reserved. Defendant contends the search warrant under which the revolver was seized was unconstitutionally obtained in violation of Amendment IV of the United States Constitution as rendered applicable to the states by Amendment XIV.
The affidavit for issuance of the warrant reads as follows:
"At 23.38 hrs. on May 2nd, 1979 under Item Number E-00116-79, the St. Bernard Parish Sheriff's Office received numberous phone calls reporting that a female who was identified as Juanita Tyson was firing a gun. D. R. 75 manned by Deputy Bonura and Dr. R 25 manned by Deputy Larry Ferand answered the call and observed a white female running out the rear door of the trailer, carrying an object in her hand, and when she saw the deputies she threw said object under the trailer. After the subject was apprehended, Deputy Bonura retrieved said object which had been thrown under trailer by Juanita Tyson and found it to contain a brownish green vegetable matter which is thought to be hashish, a bag containing a green vegetable matter which appears to be marijuana, several syringes and a 2 oz bottle containing a clear liquid.

*1178 "After the subject, Juanita Tyson was arrested for Illegal Firing of a Weapon, Possession of Narcotics, and a J. P. Warrant for Simple Kidnapping, she was advised of her rights and she stated before Deputies Spicuzza, Bonura, Stohlmann and R. D. Carreras that the gun she had been firing was hidden inside said trailer."
The two affiants were Officers Stohlmann and Bonura.
Many of the statements contained in the affidavit are somewhat in error. Defendant concedes these errors were made unintentionally. It is not true that Miss Tyson was firing a gun. In fact, one Elsie Bass fired the gun. Although the report to Officer Stohlmann was that Miss Tyson was firing a gun, the report received by Officer Bonura was that a man was firing a gun. Neither Officer Bonura nor Officer Stohlmann saw Miss Tyson throw an object under the trailer, although Officer Bonura saw Miss Tyson running out of the trailer. The only object found by Officers Stohlmann or Bonura was a purse belonging to Miss Tyson, which was found by Officer Bonura. It is true that the other stated objects were found, but not by Officers Bonura or Stohlmann.
Furthermore, Miss Tyson never said that the gun she had been firing was inside the trailer as she did not say she had fired the gun. She did, however, say that the gun was inside the trailer.
If unintentional misstatements are made by the affiants seeking to obtain a search warrant, these misstatements must be excised and the remainder used to determine whether or not the affidavit sets forth probable cause for issuance of a warrant. State v. Rey, 351 So.2d 489 (La.1977).
We have deleted the items from the affidavit that are inaccurrate, and find with the inaccuracies (which the defendant admits are unintentional) deleted, the affidavit reads as follows:
"At 23.38 hrs. on May 2nd, 1979 under Item Number E-00116-79, the St. Bernard Parish Sheriff's Office received numerous phone calls reporting that a female... was firing a gun. D. R. 75 manned by Deputy Bonura ... observed a white female running out the rear door of the trailer.... After the subject was apprehended, Deputy Bonura retrieved [an] object which had been thrown under trailer by Juanita Tyson....
"After the subject, Juanita Tyson was arrested for Illegal Firing of a Weapon, Possession of Narcotics, and a J. P. Warrant for Simple Kidnapping, she was advised of her rights and she stated before Deputies Spicuzza, Bonura, Stohlmann and R. D. Carreras that the gun [that was fired] was hidden inside said trailer."
Officers Bonura and Stohlmann as affiants were swearing to hearsay so far as Miss Tyson's statement, that the pistol was in the trailer, is concerned, and Miss Tyson stands in the role of an informant. Hearsay may be used as the basis for the issuance of a search warrant, if there are corroborating circumstances of which the affiants have personal knowledge. State v. Paciera, 290 So.2d 681 (La.1974); State v. Turner, 337 So.2d 1090 (La.1976); State v. Gilbert, 354 So.2d 508 (La.1978). Also, if the informant is identified in the affidavit, rather than permitted to remain anonymous, greater reliability is attached to the informant's alleged assertion, as the informant, if identified, is subject to questioning by the magistrate. State v. Paciera, supra. Here, reliability to Miss Tyson's assertion in the expurgated affidavit that the gun was in the trailer is lent by the fact that Officer Bonura saw Miss Tyson running from the trailer where she stated the gun was to be found. Also, the fact that Miss Tyson was arrested for the Illegal Firing of a Weapon (even if a groundless charge) lent credibility to her assertion that the gun was in the trailer. Furthermore, her statement comes close to being a declaration against interest, as she admitted that she knew where a gun that had been illegally discharged was located (and, as another part of the expurgated affidavit asserts, she was seen running out of the trailer where the gun was located), although she herself did not fire the *1179 gun. The informant is named and is stated to be under arrest, so a magistrate, if he doubted the veracity of the reported assertions, could easily bring Miss Tyson before him for questioning.
Affiants to search warrants generally are not accomplished in the law, and although they are expected to make a conscientious effort to tell the truth, we cannot expect perfection from them in preparing a document that is comparable to a legal pleading. Proof beyond a reasonable doubt is not necessary to support an affidavit for a search warrant; all that is necessary is that there be probable cause for the issuance of the warrant. State v. Lehner, No. 81-KA-0034, September 8, 1981. Only unreasonable searches fall within the constitutional prohibition. Probable cause must not be interpreted hypertechnically in such a fashion as to prevent a reasonable search. State v. Guidry, 388 So.2d 797 (La. 1980). The affidavit, with the inaccuracies striken, still would lead a magistrate to believe that probable cause existed to issue a warrant to obtain the pistol, and that is all the constitutional guarantees require.
We find no merit in Assignment of Error No. 1.

ASSIGNMENT OF ERROR NO. 4
One Harry Christoff discovered Acosta lying on the floor of his store in a pool of blood shortly after he was robbed, beaten, and shot. Acosta said "they" had robbed and beaten him. Christoff left the store to call authorities. When he returned, Acosta made the following statement to him:
"He told me that two men had came into the store and one guy was tall with light brown hair, kind of long, almost to the shoulder, and the other shorter with a moustache, and he said one of them ordered something, a box of matches or something and when he went to get them to him or open the cash register drawer the tall guy reached over the counter and hit him in the head with a pistol and he fell down and then the guy jumped over the counter and grabbed the money and think they broke his legs because he couldn't move it."
Officer Stohlmann arrived on the scene shortly thereafter. Acosta made the following statement to him:
"He told me two men came in the store and one man asked for matches and when he reached down there one of the subjects hit him on the head with what appeared to be a gun and as he went down from the blow they jumped over the counter and continued to take him and beat him severely. He kept saying, `Don't hurt me, take what you want, but, they evern (sic) stomped on my leg.' He said that twice, `Even stomped on my leg.'"
At trial, over defense counsel's objections, both Christoff and Stohlmann testified to these statements. In argument supporting defense's assignment of error concerning the admission of the testimony as to these statements by Acosta, defendant makes the argument that any testimony as to these statements was hearsay and, therefore, inadmissible.
However, the hearsay rule has many exceptions, among them the excited utterance rule. If an utterance is made by a startled person who has not had sufficient time to reflect on the events that have transpired to fabricate a false account, in certain circumstances, these statements are admitted as falling within the excited utterance exception to the hearsay rule.
The factors that are to be considered in determining whether or not a statement constitutes an excited utterance are set forth at length in State v. Henderson, 362 So.2d 1358, 1362 (La.1978), as follows:
"Many factors enter into determining whether in fact the second requirement has been fulfilled and whether a declarant was at the time of an offered statement under the influence of an exciting event. Probably the most important of these is the time factor. In this connection the trial court must determine whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought *1180 process. Several additional factors which may indicate that the statement was the result of reflective thought, but which do not automatically justify exclusion, are as follows: Evidence that the statement was self-serving or made in response to an inquiry; Expansion of the excited utterance beyond a description of the exciting event into past facts or the future; Proof that the declarant performed tasks requiring reflective thought processes between the event and the statement. See, State v. Smith, 285 So.2d 240 (La.1973); C. McCormick, Evidence, § 297 at 705, et seq. (2d ed. 1972); G. Pugh, Louisiana Evidence Law, at 515 (1974), at 208 (Supp.1976); Comment, Excited Utterances and Present Sense Impressions as Exceptions to the Hearsay Rule in Louisiana, 29 La.L.Rev. 661 (1969)."
In the present case the robbery occurred at approximately 6:30 a. m. Christoff arrived at the scene at approximately 6:40 a. m. and discovered the victim. Acosta made the first statement (to Christoff) immediately after Christoff had telephoned authorities, the telephone call having taken only a brief time. Officer Stohlmann arrived at the scene at approximately 6:50 a. m. He asked Acosta, "Man, what happened?" This brief question obviously was not sufficient to alter Acosta's continuous state of excitement. In the same state of excitement Acosta proceeded to make his second statement (to Stohlmann). The statement that Stohlmann asserts was made to him merely corroborated Christoff's testimony as to the earlier statement (to Christoff). The statements of Acosta were not self-serving. The testimony indicates Acosta was in great pain, the victim of a pistol whipping, broken leg, beating and shooting, was but half sitting up, and could not have engaged in reflective thought.
The statements clearly fell within the excited utterance exception to the hearsay rule. The fourth assignment of error is without merit.

ASSIGNMENTS OF ERROR NOS. 2, 6, 7, 8, 9, AND 10
By these assignments, the defense argues that the trial court erred in allowing references to the arrest of the co-defendant Jerald Nuccio, in permitting the introduction of two exhibits allegedly unconnected with the case, and in instructing the jury with regard to the law of principals.
Defendant was charged alone by bill of information with the armed robbery of Acosta. Nevertheless, from Christoff's and Stohlmann's accounts of the victim's statements, it was clear that two men had participated in the offense. According to a Detective Ralph Carreras, on the night of May 27, 1979, he had arrested one Jerald Nuccio on an unrelated charge of narcotics distribution. Over defense counsel's objection to "... anything concerning him. He is not on trial today," Carreras testified that at booking he took $57.00 from Nuccio, mostly in coins, and "... a red handkerchief that he had wrapped around his hand... his hand was cut across the knuckles." With defense counsel protesting as to the "immaterial, inflammatory and prejudicial" nature of the testimony, Carreras added that the coins had aroused his suspicion "[b]ecause they just had an armed robbery that occurred in the lower part of St. Bernard Parish at a small grocery store [i.e., Acosta's] ... a little over a hundred dollars was taken ... and the cash drawer itself was taken..." According to the officer, "... the investigation continued and it was learned that Jerald Nuccio and [defendant] had been hanging around together quite often. And, from the description given at the time of the armed robbery, the description fit pretty close to [defendant] and Jerald Nuccio." Carreras identified a photograph of Nuccio, and the handkerchief and money taken from his prisoner at the time of booking. Over defense's objection, the state then introduced the exhibits into evidence.
Defendant argues that neither the red handkerchief nor the stack of coins had ever been positively linked to the Acosta robbery, a fact conceded by Carreras under cross-examination. Defendant maintains that apart from this lack of connexity, the *1181 exhibits appeared extremely prejudicial, as they bolstered the hearsay accounts given of the victim's statements by Christoff and Deputy Stohlmann, and lent credence to Carreras' "suspicions" of Nuccio's participation in the offense with defendant.
As set forth in State v. Drew, 360 So.2d 500, 518 (La.1978), this Court has repeatedly held that "[f]or the admission of demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case." Lack of positive identification goes to the weight of the evidence, not its admissibility, and, ultimately, connexity is a matter for the trier of fact to decide. State v. Haarala, 398 So.2d 1093 (La.1981). In this case the state's evidence adequately established at least the probable connexity of the red handkerchief. Victor Alphonso, Jr. testified that at approximately 6:30 on the morning of May 27, 1979, he stopped by Acosta's grocery and picked up a sandwich for lunch. As he walked out of the store, he noticed defendant walking toward him. At the time, defendant wore his hair "kind of brunette ... about not-quite shoulder length, but down below his ears." According to Alphonso, when defendant saw him, he turned and walked back to a solid black, late model car with chrome rims, occupied by a second person in the front seat. The companion, described by Alphonso as shorter than defendant, with dark hair and a moustache, got out of the car as defendant approached, "... bent over under the front seat and grabbed a piece of red cloth and handed it to him and he stuck it in his pocket." Alphonso then got into his own car and drove off, leaving the two men standing outside Acosta's. Minutes later, Mark Bartnesky drove by on his way to work. He noticed the black car parked outside the grocery, "... and when I went past I seen two boys running out and I know one had like a red handkerchief around his face, but I didn't think nothing of it." Bartnesky recalled that one of the men had "... kind of sandy hair and one dark hair."
According to Harry Christoff, the victim had given him a description of his assailants: "... one guy was tall with light brown hair, kind of long, almost to the shoulder, and the other shorter with a moustache...." For his part, Carreras told the jury that his investigation had determined that defendant owned a black, 1977 Buick with "[m]ag-type wheels and whitewall tires." He also described Nuccio as approximately four inches shorter than defendant, with darker hair. At the time of his arrest, Nuccio wore a moustache.
The evidence at trial thus disclosed that Nuccio matched the general description of the second perpetrator given by three separate witnesses, including the victim. The state therefore had more than Carreras' unsupported suspicions to connect the two men together, and with the Acosta robbery. On this record, the prosecution had established at least a probability that the red handkerchief taken from Nuccio at the time of booking (and covering raw knuckles) appeared connected with the Acosta robbery. As Haarala, supra, indicates, the matter was ultimately for the jury to decide.
With regard to the money taken from Nuccio, Christoff testified that when he walked into the grocery, he found Acosta slumped on the floor, the cash register above him opened, and loose change scattered over the floor. He also testified that the victim claimed his assailants had taken his money as well. According to Carreras, over one hundred dollars, and the cash register drawer, had disappeared. The state could not, however, establish the amount actually taken, although it alleged $43.00 in the bill of information. The state had demonstrated the connexity of the handkerchief, and the amount of money taken from Nuccio at the same time was thereby not wholly irrelevant to the case. The matter again was for the jury to decide. State v. Holmes, 354 So.2d 1282 (La.1977); State v. Haarala, supra.
Defendant also argues in brief that the trial court erred in instructing the jury on the law concerning principals under LSA-R.S. *1182 14:24. The trial judge evidently decided to include the charge "... on the basis that [counsel for defendant] brought up the matter during his argument which necessitated the state's reply which I feel I must charge to make the matter straight in the jury's mind...." The transcript of closing arguments does not appear in the present case. In any event, the trial court rejected the state's special requested charge on the matter and gave an instruction on its own, one which tracked the language of R.S. 14:24 exactly. Defendant now maintains that the instruction expanded the scope of the case beyond the notice provided by the bill of information under which defendant alone was charged with the offense.
As set forth in State v. Marse, 365 So.2d 1319, 1323 (La.1979), LSA-C.Cr.P. art. 802 imposes on the trial judge a "... basic obligation to charge the jury as to the law applicable to the case, under which he is required to cover every phase of the case supported by the evidence whether or not accepted by him as true." In this case, the testimony of Alphonso and Bartnesky, and Christoff's hearsay account of Acosta's statements, made clear that two men had been involved in the armed robbery. From the description provided by the victim, it appears that defendant wielded the pistol, and used it to club the victim, while his companion Nuccio leaped over the counter for the cash register. In any event, under art. 802 the trial court was clearly correct in advising the jury that under the law concerning principals to a crime, both men were guilty of the offense, no matter who carried the gun or who went into the cash register. LSA-R.S. 14:24 provides in this regard that all persons "... concerned in the commission of a crime ... whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." See State v. McAllister, 366 So.2d 1340 (La.1978).
Defendant's argument that he was unprepared for an allegedly sudden expansion of the case to include the actions of Nuccio flies in the face of the record. After his arrest on the night of May 27, 1979, defendant gave a statement to the authorities naming Nuccio as the perpetrator of the Acosta robbery. In that statement he attempted to discount his role in the offense entirely. On the basis of that statement, the police then arrested Nuccio, already in jail for the narcotics charge. The next day Nuccio gave the authorities a statement of his own. Defendant moved to suppress both statements, arguing that Nuccio's identity had been learned by the police only as the result of a prior, and allegedly coerced, confession of defendant.[1] Defendant therefore had actual notice well in advance of trial that the state's evidence would indicate the involvement of two men in the offense, and that testimony concerning Nuccio would almost certainly be introduced. Moreover, while LSA-C.Cr.P. art. 494 authorizes the joinder of two or more defendants in a single indictment, it does not compel such a joinder. As defendant cannot convincingly demonstrate that he was misled by the indictment, or surprised by the state's evidence at trial, these assignments are without merit.
The remaining assignments of error (Nos. 3 and 5) were withdrawn by defendant.
We, therefore, affirm Krolowitz's conviction and sentence.
DIXON, C. J., dissents with reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent from the treatment of the hearsay issues.
NOTES
[*] Judges Grover L. Covington, Luther F. Cole and J. Louis Watkins, Jr. of the First Circuit Court of Appeal participated in this decision as Associates Justices Ad Hoc, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche and Lemmon.
[1] In fact, the state did not introduce defendant's confession at trial.