467 So.2d 1177 (1985)
STATE of Louisiana, Appellee,
v.
Richard HOLMES, Appellant.
No. 16809-KA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1985.
Writ Denied June 7, 1985.
*1180 Evans, Feist, Auer & Keene by George H. Mills, Jr., Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., A.M. Stroud, III and John Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Before HALL, SEXTON and NORRIS, JJ.
NORRIS, Judge.
Appellant Richard Holmes was arrested on March 11, 1978 and charged by bill of information with two counts of armed robbery, LSA-R.S. 14:64, and with one count of attempted first-degree murder, LSA-R.S. 14:27 and 14:30. He waived formal arraignment and pled not guilty and not guilty by reason of insanity on all counts. The first sanity commission convened in November 1978 and recommended that Holmes was competent to proceed. By November 1979, however, the same sanity commission members testified that appellant's mental condition had so deteriorated as to render him unable to assist in his defense. Accordingly, the trial court remanded him to the Feliciana Forensic Facility for psychiatric treatment. Two subsequent sanity commissions also recommended continued psychiatric treatment. In June 1982, the commission found that appellant's condition was substantially improved or in remission and the trial court ruled that he was competent to proceed. After two lengthy hearings on motions to suppress, a number of joint motions for continuance, the enrolment of new counsel (appellant's present attorney is the fourth one in this matter, all appointed), and an additional sanity hearing, trial was finally conducted in January 1984 on the two armed robbery counts remaining in an amended bill of information. The twelve-man jury unanimously found appellant guilty on both counts at the end of the five-day trial on January 27, 1984. The trial court imposed two concurrent sentences of forty years at hard labor without benefit of probation, parole or suspension of sentence. Holmes now appeals, urging six assignments of error. For the reasons expressed, we affirm.

FACTS
The incidents occurred on Saturday evening, March 11, 1978, in northern Caddo Parish. Shortly before 9:00 p.m., a tall, well-built black man wearing a light corduroy jacket and a white knit cap entered the Tiger Mart # 2, a convenience store located off Hwy. 1 in Oil City. Two employees were present: Ms. Brackman, who was working the cash register, and Ms. Brownlee, who was stocking shelves in the rear. The store was otherwise empty. After meandering *1181 in the aisles a few minutes, the customer walked to the counter with a beer and asked Ms. Brackman for some mouthwash. At his request, Ms. Brackman turned around to fetch a bottle of Dr. Tichenor's, the only brand kept behind the counter. When she turned back, the customer was pointing a pistol at her and told her to put the money in a paper sack. He instructed Ms. Brownlee to lie on the floor. Irked by Ms. Brackman's nervousness and inability to fill the sack fast enough, he nudged her aside and emptied the cash register himself. He told her to lie down on the floor and stay down, as "he had someone outside the window with a shotgun and he would shoot us if we tried to move." Thus they remained for several minutes after the robber had fled, until a customer happened in, who had seen neither the robber nor his alleged accomplice in the parking lot. They promptly called the police.
About thirty minutes later, a black man knocked on the drive-in window at K's # 1 Liquor Mart south of Vivian, about twelve or fifteen miles up the road from Oil City. K's is apparently half-store and half-residence. The owner, Mr. Keener, was in the front, tending the store and preparing to close for the night. His wife was in the back room, watching television. The customer removed his wallet, placed it on the counter, and asked for a half-pint of whiskey. When Mr. Keener returned to the counter with the bottle, the customer pulled a Smith and Wesson .38 revolver and told him to hand over the money. Hoping to attract his wife's attention, Mr. Keener began to talk very loudly, telling the robber to be careful with that gun. As Mr. Keener handed over the money, the robber was carefully separating the cash from the checks. Mrs. Keener, alerted by her husband's persistent loud talking, poked her head through the door and surmised there was trouble afoot. She ducked back into the main room, grabbed a shotgun, returned and fired at the man in the window. Although the robber was knocked down by the shot, he got back up immediately, fired a bullet into the house, and fled. He left his wallet on Mr. Keener's counter and numerous bloodstained bills strewn about the parking lot in his wake. Neither Mr. nor Mrs. Keener was injured; they called the police immediately.
Meanwhile, Officer Copeland of the Vivian Police Department had overheard the Caddo Sheriff Department radio dispatch reporting the Tiger Mart robbery in Oil City. On a hunch that the suspect might be heading north, he stationed himself on the side of Hwy. 1, just south of the Vivian city limits, to look for anyone fitting the description given by Ms. Brackman. His position was also about two hundred yards up the road from the driveway to K's Liquor Mart. As he heard a dispatch from Vivian Police Headquarters about the second robbery, he saw someone tearing out of the driveway in an Oldsmobile at a high speed. Copeland pulled onto the highway, directly blocking the suspect's northward escape. The suspect stopped, but as soon as Copeland alit from his patrol car to question him, the suspect started to back up and drive around the patrol car.
About this time, Vivian policeman Donnis Jones was proceeding southward on Hwy. 1. He had received Mr. Keener's call at the station. He spied Copeland's flashing lights and the Oldsmobile attempting to get away. He likewise drove up and blocked the suspect's escape route. The suspect stopped again and Copeland nestled in behind him. With the suspect hemmed in, the officers made him stick his hands out his window, to prove he was unarmed. They then instructed him to get out of the car, which he did, leaving the door open. The officers patted him down and discovered he was dazed and covered with blood. They handcuffed him and Officer Jones drove him to North Caddo Hospital. Officer Copeland stayed with the car until the wrecker and Caddo Sheriff personnel arrived. The defendant was transferred to LSU Medical Center in Shreveport later that night, with gunshot wounds to his face and shoulder.

*1182 ASSIGNMENT NO. 1
In this assignment of error, Holmes contends the trial court erred in finding him competent to stand trial.
The basic law of mental competence is rather simple. Criminal proceedings must be suspended against a defendant who is found to be mentally incompetent. LSA-C. Cr.P. arts. 642, 648. Mental capacity to proceed is defined in LSA-C.Cr.P. art. 641 as follows:
Mental incapacity to proceed exists when, as a result of mental disease, or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.
Louisiana law also establishes a presumption of sanity. LSA-R.S. 15:432. The defense bears the burden of proving, by a preponderance of the evidence, that the defendant lacks the capacity to understand the proceedings against him or to assist in his defense. State v. Rogers, 419 So.2d 840 (La.1982). The state is not required to offer proof of sanity. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983). The trial court's determination of defendant's capacity to proceed is entitled to great weight and will not be overturned absent an abuse of discretion. State v. Brogdon, 426 So.2d 158 (La.1983).
Only the application of the law to a particular case poses difficulty. The lead case interpreting article 641 and applying it to the facts of a case is State v. Bennett, 345 So.2d 1129 (La.1977). We note that the medical experts who testified in the instant case based their recommendations on the guidelines of Bennett.
Holmes's chief medical complaint has been hallucinations. He claims to see and hear his brother Red, who was killed in 1971. Holmes's family members asserted that Richard, the appellant, and Red were extremely close and that Red's shooting death on Thanksgiving Day in 1971 was very traumatic. Family members even claim to have observed appellant conversing with thin air; when approached about this strange conduct, or told that Red was dead, appellant was said to have reacted violently. More recently, one of appellant's neighbors, a Mr. Miller, also died suddenly; since then, appellant has reportedly planned a number of fishing trips, including himself, Red and Mr. Miller. Appellant's aunt claimed she once heard him shout at Red through an open window. Appellant also claims to suffer from headaches and insomnia. He seems to be mildly retarded.
At the July 1982 sanity hearing, three medical experts testified. Dr. Ryder said Holmes suffered from schizophrenia and paranoia. R.p. 124-125. He nevertheless felt that four years of medical and psychiatric treatment had brought about an improvement or remission of the condition. He reluctantly said that Holmes could withstand the stress of the trial and assist in his own defense. R.p. 132. Dr. Wilkinson also said that Holmes suffered from schizophrenia but that it was in remission. R.p. 142. Dr. Wilkinson felt that in spite of appellant's limited mental ability, he nevertheless understood the charges against him and knew the difference between pleading guilty and not guilty. R.p. 133. The third expert to testify was Dr. Jiminez. She testified that Holmes was unquestionably competent to stand trial. She said he was malingering. R.p. 159. She concluded there was definitely no psychosis, and she doubted the hallucinations. R.p. 161.
We feel that from all this evidence, the trial court was entitled to find Holmes competent to proceed. It is of no moment that an earlier sanity commission had found him incompetent to proceed, when the evidence at the instant hearing so strongly suggests improvement or remission of the earlier disfunctions. The only member of the July 1982 commission who had served on the earlier commission, Dr. Ryder, directly attributed the improvement to the extensive medication and treatment. R.p. 128. Another member of the instant commission observed improvement as well. R.p. 142. The third member, Dr. Jiminez, felt that Holmes suffered from no mental illness at *1183 all. R.p. 168. Viewing this testimony in light most favorable to the prosecution, we cannot agree with appellant's assertion that no rational trier of fact could have found him competent to proceed. The evidence easily withstands this attack under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Holmes continued to raise the issue of his incompetence to proceed, even after the trial court's July 1982 hearing. The record forwarded to us does not contain a transcript of the later sanity hearing, which convened in June 1983. The physicians who served on that commission, however, did testify at the trial on the merits. We doubt whether this trial testimony is relevant in an assignment of error that complains only of a pre-trial ruling. But we do not reach the issue because, either way, the evidence was adequate to sustain the trial court's finding.
Two significant items from the trial testimony deserve mention. First, Dr. Ryder apparently attempted to retract his earlier recommendation that Holmes was competent to proceed. R.p. 661, 707. He was the only physician to assert categorically that Holmes never had the capacity to proceed, R.p. 661, in spite of his contrary testimony at the June 1982 hearing. R.p. 132. We note that Dr. Ryder was originally hired by the defense, not by the court. R.p. 654. Second, Dr. Jiminez was admittedly emphatic in denouncing Holmes's alleged mental problems; nevertheless, her factual observations corroborated those of the other state experts and supported the theory of malingering or manipulating his environment. R.p. 948; cf. Dr. Mauroner's testimony at R.p. 845. It is to Dr. Jiminez's credit that she observed Holmes far more than any other physician who testified, thus lending considerable weight to her observations. R.p. 944.
The trial court's determination that Holmes could proceed to trial is not wrong. This assignment lacks merit.

ASSIGNMENT NO. 2
In this assignment of error, Holmes claims the trial court erroneously allowed the contents of his wallet to be admitted into evidence and to be referred to in closing argument. This was error, Holmes claims, because the contents were never identified or moved into evidence.
In support of this argument, appellant asserts that only one person was truly acquainted with the contents, Mrs. Keener, the victim who shot the robber. She looked at the wallet, which the robber had left on the drive-in counter, and saw the driver's license it contained. Later that evening, Caddo Parish Sheriff Deputies seized the wallet along with the unbought bottle of liquor, some shotgun shells and wadding. R.p. 536. Defendant claims this was an inadequate foundation for bringing the wallet's contents into evidence.
In order to introduce demonstrative evidence, it suffices that the foundation laid establish more probably than not that the object is one connected with the case. Lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Downing, 451 So.2d 1221 (La.App. 2d Cir.1984); State v. Taylor, 422 So.2d 109 (La.1982).
Holmes's wallet was admitted into evidence after it had been identified by the victim, Mr. Keener. R.p. 483. Mr. Keener clearly testified that the robber left the wallet on the counter when he fled. R.p. 465. Mr. Keener further testified that Caddo Parish Sheriff Deputies seized the wallet and looked inside. R.p. 465. Mrs. Keener also looked and saw the driver's license. R.p. 490. Deputy Hood logged it into evidence after he received it from Deputies Jones and McCrary, who were also at the scene. R.p. 547. Deputy Bass transferred it to the D.A.'s office for examination. R.p. 556. When the assistant D.A. returned it, Deputy Bass examined it to make sure it had not been tampered with. R.p. 557. Finally, Deputy Bass testified that he brought it to the D.A.'s office on the day before trial. R.p. 559.
From this evidence it is clear that the state presented adequate testimony linking *1184 the wallet to the crime and establishing the chain of possession from the night of the crime to the trial. Naturally, there will always be lingering doubts about the security of evidence when the trial is so remote in time from the alleged crime. The jury could properly entertain those doubts and allow them to diminish the weight of the evidence accordingly. But appellant's nebulous and unsubstantiated complaint does not destroy the admissibility of the evidence.
This assignment lacks merit.

ASSIGNMENT NO. 5
In this assignment of error, Holmes contends the trial court erred in failing to suppress a statement he made under investigation in the hospital on March 13, 1978.
The argument seems to raise two distinct issues. First, it attacks the admissibility of the statement under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the federal standard of voluntariness of confessions. This is a legal question and it was resolved against appellant in the second motion to suppress. Second, the assignment attacks the statement under the Louisiana law of waiver, LSA-Const. Art. I § 16, LSA-C.Cr.P. art. 703 D, LSA-R.S. 15:451. We specifically note that Holmes has not assigned as error the jury's verdict that he was sane at the time of the offense; thus our examination will be confined to the legal issue of his mental state as it affected the confession.
Setting aside momentarily the state insanity issue, we consider whether the statement was elicited in facial violation of Miranda. In Miranda, the United States Supreme Court held that the fifth and fourteenth amendments' prohibition against compelled self-incrimination requires that custodial interrogation be preceded by advice to the suspect that he has the right to remain silent and also the right to the presence of an attorney. U.S.C.A.-Const. amends. v, xiv; 384 U.S. at 479. If the suspect invokes the right to silence, the interrogation must cease. If the suspect invokes the right to have counsel present, a statement subsequently made is inadmissible. A suspect may nevertheless waive his rights, and a statement so made is not inadmissible merely because there was no explicit waiver of right to counsel. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).
When Officers Copeland and Jones initially detained the suspect, they did not inform him of his complete Miranda rights, but this is of no moment because Holmes remained absolutely silent while in their custody. R.p.p. 301, 516. At North Caddo Memorial Hospital, Deputies McCrary and Smith took Holmes into custody and gave him his rights under Miranda; Holmes told them he understood his rights and did not want to make a statement. R.p. 314. The deputies asked him no further questions; they drove him to the LSU Medical Center and entered him there for further treatment. The following Monday morning, Deputies Pouncey and Malec went to Holmes's room for the purpose of interrogating him. Pouncey read him his Miranda rights once again; Holmes said he understood them, but he could not sign the card because his arm was in a sling. R.p. 330-331. Pouncey then advised him he was being held for two robberies and asked him if he was willing to waive his rights. Holmes did not answer this question; rather, he admitted his guilt of the crimes, saying he was compelled at gunpoint by two hitchhikers he had picked up down the road. R.p.p. 331, 567-568. Holmes could not identify his assailants, but he said he thought one of them lived on Cooper Road. R.p. 568. Then Holmes suddenly stopped talking and asked for a lawyer. R.p. 332. Pouncey promptly ceased questioning, except to ask him to sign a consent form to search the car. Holmes refused. The entire interview lasted about fifteen minutes.
Considering the Miranda issue alone, we can detect no violation of Holmes's rights. Holmes received full warnings twice and partial warnings another time. In each instance, he said he understood his rights. On the night of the *1185 arrest, he showed enough comprehension to invoke his right of silence; this request was honored. The second interrogation occurred after a significant time had elapsed and was preceded by proper Miranda warnings, and was therefore permissible. Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). We are reluctant to call Deputy Pouncey's questioning an "interrogation" about the crime, since he had asked Homes nothing more than whether he understood his rights and would waive them. Cf. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Even if it was an interrogation, Holmes showed enough comprehension subsequently to invoke his right of counsel and to refuse to sign a consent to search form. An explicit waiver is not necessary. North Carolina v. Butler, supra. If Holmes had wanted not to make a statement, he could have invoked a right, as he did moments later, and as he had done the previous Saturday night. Thus there was no facial violation of Holmes's constitutional rights.
We now address Holmes's further contention that his mental condition was such that he could not have understood the rights he received. When insanity is the basis of a motion to suppress a purported confession, the state must prove that the defendant had mental capacity to waive his right against self-incrimination. LSA-C.Cr.P. art. 703 D; LSA-R.S. 15:451. The trial court's determination on this score is entitled to great weight. State v. Thompson, 429 So.2d 862 (La.1983). The question of voluntariness of a confession, including a determination of the defendant's psychological state of mind, will be answered from the facts and circumstances of each case. State v. Williams, 383 So.2d 369 (La.1980), rehearing denied, 450 U.S. 971, 101 S.Ct. 1493, 67 L.Ed.2d 622 (1981). Diminished mental condition does not automatically render a confession involuntary; only a showing of inability to understand one's rights will do so. State v. Benoit, 440 So.2d 129 (La.1983); cf. State v. Mitchell, 437 So.2d 264 (La.1983).
As was the case on the issue of capacity to proceed, the evidence here is ample, including the lay testimony of five law enforcement officers who observed Holmes around the time of the alleged crime and confession, as well as expert testimony from Dr. Little and Dr. Jiminez. It is proper to consider both lay and expert testimony. State v. Claibon, 395 So.2d 770 (La.1981). Officer Jones, who drove Holmes from the place of the arrest to North Caddo Memorial Hospital, testified that Holmes was alert and responsive, and that his walk was normal. R.p. 305. Deputy Pouncey was able to report that by the following Monday morning, Holmes was still acting normal and "walking around" his hospital room with a portable IV. R.p. 329. We further note that Holmes had the presence of mind to invoke his Miranda rights both the morning of the confession and the Saturday night before. All these facts suggest a moderate degree of understanding and undermine appellant's hypothesis of insanity.
The first expert to testify was Dr. Little, who expressed the opinion that Holmes could not understand his rights when he uttered the confession. R.p. 347. She based this opinion on three hour-long visits with Holmes, beginning eight months after the crime and spread approximately a year apart. Dr. Jiminez reached the opposite conclusion. R.p. 372. She had seen Holmes about a dozen times, although her first consultation with him was not until nearly two and one half years after the crime. From this conflicting testimony, the trial court could certainly conclude the confession was voluntary.
Given these facts, Holmes's mental condition did not preclude the voluntary giving of a confession. This assignment lacks merit.

ASSIGNMENT NO. 4
In this assignment of error, appellant claims the trial court erred in failing to suppress evidence seized from his car at the scene of the crime and evidence seized from his car as a result of a subsequent search warrant.
*1186 The evidence was seized under the following circumstances. Officers Copeland and Jones had stopped the suspect and handcuffed him; Officer Jones left to drive the suspect to the hospital. Copeland remained behind, awaiting the wrecker. Copeland went to the opened driver's door and, without actually entering the car, glanced in and saw a white knit cap on the floor. He then crouched down and aimed his flashlight under the driver's seat and saw the pistol there. R.p.p. 256, 261. He denies ever touching the gun. When Deputy Pouncey presently arrived, he too looked under the swivel seat and saw the pistol. He denies telling anyone about it. Meanwhile, the wrecker arrived. Deputy Malec, who was to photograph the vehicle, drove up a few minutes later. He testified that the pistol was "on the floorboard" and that he may have "unintentionally" swivelled the seat. R.p. 228. Malec also says that Pouncey instructed him to seize the pistol. R.p. 229. There was, of course, no search warrant at the time. The wrecker towed the car to the Caddo Parish Sheriff's Academy. The following Monday, Holmes refused to consent to a search of his car. Accordingly, Deputy Pouncey swore out an affidavit which contained an account of the suspect's attempted escape, as well as descriptions from the victims, including the representation that the suspect was possibly armed with a .38 caliber pistol. The search turned up a paper bag stuffed between the grille and the radiator, filled with cash and checks made out to the Tiger Mart. A coat, matching the description given by the Tiger Mart victims, was found hidden in the same general area. The white knit cap was also seized.
The federal and state constitutions prohibit unreasonable searches and seizures. U.S.C.A.-Const. amends. iv, xiv; LSA-Const. Art. I § 5. Warrantless searches are per se unreasonable. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Guzman, 362 So.2d 744 (La.1978), cert. denied 443 U.S. 912, 99 S.Ct. 3103, 61 L.Ed.2d 876 (1979). Thus the state must prove that a warrantless search is justified under one of the recognized exceptions to the warrant requirement. LSA-C.Cr.P. art. 703 D.
The state does not now contend the pistol was subject to the plain view exception. It seems obvious that between the time the appellant was carried away and the time Deputy Malec arrived, the pistol had moved from a place of concealment under the seat to a place of conspicuousness on the floorboard; in its original posture, it was not an object in plain view. Rather, the state contends it was entitled to search the car at the scene under the automobile emergency expection. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); State v. Redfearn, 441 So.2d 200 (La.1983), and numerous other authorities. The United States Supreme Court explained the automobile emergency exception appropriately to this case in Chambers v. Maroney, 399 U.S. 42, at 51-52, 90 S.Ct. 1975, at 1981-82, 26 L.Ed.2d 419 (1970).
Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the "lesser" intrusion is permissible until the magistrate authorizes the "greater." But which is the "greater" and which the "lesser" intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.
The facts constituting probable cause were abundant. The police knew that two armed robberies had just taken place; since the first was in Oil City and the second south of Vivian, Officer Copeland assumed the suspect would continue northward and he positioned himself accordingly. Although there was no description of the car, there was a general description *1187 of the suspect, and Holmes matched that description. When Holmes was first spotted, he was peeling impetuously out the driveway where the second robbery had just been reported. As if this were not enough to link Holmes to the crime, Holmes obliged by engaging in evasive tactics until he was finally cornered by Officers Copeland and Jones. He surrendered peacefully. We find the search was based on facts that would justify issuance of a warrant, even though a warrant was not actually obtained. See United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).
We also feel there were exigent circumstances present. It is exceedingly dangerous to leave an abandoned car, which might contain a large quantity of stolen money, parked on a major state highway on a Saturday night. See State v. Edsall, 385 So.2d 207, 211 (La.1980).
Appellant further contends the warrant subsequently issued was invalid for two reasons. We will discuss them perfunctorily; since it was permissible for the deputies to conduct a complete warrantless search at the scene, the later search at the Sheriff's Academy was likewise permissible, irrespective of the alleged defects in the warrant. State v. Redfearn, supra.
Appellant first contends that Deputy Pouncey's reference to the illegally seized pistol in his affidavit vitiates the warrant. Because the pistol was legally seized, it could have been properly included in the warrant. Even so, the affidavit does not specifically allege the seizure of the pistol; it only avers that the robberies were committed with a pistol and that the pistol is probably concealed in the car. The warrant will pass muster without that allegation.
Second, appellant contends the warrant was invalid because Deputy Pouncey's allegations in the affidavit were conclusory and failed to identify their source. We agree that the affidavit fails to mention by name the source of the affiant's information, but hearsay does not necessarily vitiate an affidavit as long as the uncontested facts serve to establish probable cause to search. State v. Mann, 431 So.2d 862 (La.App. 2d Cir.1983), writ denied 439 So.2d 1074 (La.1983); State v. Krolowitz, 407 So.2d 1175 (La.1981). Arguably, it would have been possible for the issuing magistrate to ascertain the sources, which were obviously eyewitnesses, investigating officers and victims of the crimes. Furthermore, we consider that Deputy Pouncey's March 13 search, pursuant to the warrant, was conducted in objective good-faith reliance on the warrant. See United States v. Leon, ___ U.S. ___, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We particularly note that the affidavit contains no intentional, false representations, such as would vitiate the warrant under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), nor does it contain such patent defects that no officer could have relied on it, under Massachusetts v. Sheppard, ___ U.S. ___, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Given these factors and the dubious nature of appellant's hearsay contention, we feel the facts fully support Pouncey's good-faith reliance on the warrant. We find the search and seizure here valid because the warrant generated the good-faith search contemplated by United States v. Leon, supra, and because a warrantless search would have been permissible under State v. Redfearn, supra.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 3
Having found appellant's incriminating statement (Assignment No. 5) and the physical evidence (Assignment No. 4) admissible against him, we turn now to appellant's Assignment No. 3. In this assignment, appellant contends the trial court erred in refusing to give a requested jury instruction concerning the defense of compulsion.
The judge is bound to charge the jury as to the law applicable to the case. LSA-C.Cr.P. art. 802; State v. Belgard, 410 So.2d 720 (La.1982). Special jury *1188 charges are governed by LSA-C.Cr.P. art. 807, which provides in part:
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
The trial court's duty to charge extends to any theory of defense which the jurors could reasonably infer from the evidence. State v. Johnson, 438 So.2d 1091 (La.1983). A special requested charge must be supported by the evidence presented at trial, because the court is not bound to instruct the jury on abstract principles of law. State v. Telford, 384 So.2d 347 (La.1980).
In support of the proposition that compulsion is an element of the case, appellant proffers two pieces of evidence. First is his statement to Ms. Brackman and Ms. Brownlee at the Tiger Mart, that "he had someone outside the window with a shotgun and he would shoot us if we tried to move." R.p. 416. Second is his statement to Deputy Pouncey on the Monday morning after the robberies, admitting his guilt but insisting that two armed hitchhikers had compelled him to do it. R.p. 332.
The requested jury charge read as follows:
The defendant's conduct, otherwise criminal, is justified if the offense charged was committed through the compulsion of threats by another of death or great bodily harm and the defendant reasonably believed the person making the threat was present and would carry out the threats immediately if the defendant did not commit the crime.
Thus, if you find:
1) that the defendant committed the offense charged because he was compelled by threats of death or great bodily harm; and
2) that the defendant reasonably believed the person making the threat(s) was present and would carry out the threats immediately if the defendant did not commit the crime;
then you must find the defendant not guilty.
When the requested instructions were denied, defense counsel entered a timely objection. R.p. 1026.
We note at the outset that the wording of the requested charge closely tracks the language of the statute, LSA-R.S. 14:18(6) and thus cannot be excluded on the ground that it requires "qualification, limitation, or explanation," or that it is not "wholly correct." If the requested instruction is to be excluded, it must be because the instruction is not adequately supported by the evidence. We believe this to be the case.
In so holding, we are not unmindful of a number of supreme court decisions that have held refusal of a requested jury instruction to be reversible error. The first such case was State v. Robichaux, 165 La. 497, 115 So. 728 (1928). Other cases to the same effect include State v. Youngblood, 235 La. 1087, 106 So.2d 689 (1958); State v. Phillips, 248 La. 703, 181 So.2d 753 (1966); and State v. Montalbano, 257 La. 884, 244 So.2d 820 (1971).
The most eloquent statement appears in State v. Miller, 338 So.2d 678 (La.1976). In that case, defendant had been in a quarrel with his estranged wife and some of her friends. Tempers grew hot and defendant fired a shotgun, fortunately hitting no one. He was charged with attempted second-degree murder. The defendant testified that he fired the shot not with the intention of hitting anyone, but rather to scare one of his wife's friends, who he feared would shoot him as he attempted to escape from the argument scene. The jury convicted him of attempted manslaughter. On appeal, defendant disputed the trial court's refusal to give an instruction of justification under LSA-R.S. 14:18(6), 19, 20. The supreme court reversed and explained:
In view of defendant's conduct immediately preceding the shooting, his version of the shooting can be characterized as extremely doubtful. And this conclusion undoubtedly influenced the trial judge to deny the requested charge. However, *1189 the question is not what the judge believed the evidence proved, or even what view this Court has of the evidence. The question is, instead, what the jury would believe the evidence established if they had been instructed on the law of justification.
338 So.2d at 681.
The tenor of this passage seems to be that any evidence of a defense will necessitate an appropriate instruction.
However, in cases more recent than Miller, the supreme court has receded from this position and has applied the rule of harmless error to resolve the issue. See State v. Marse, 365 So.2d 1319 (La.1978) and State v. Mead, 377 So.2d 79 (La.1979). This development is consistent with the general principle announced in State v. Gibson, 391 So.2d 421 (La.1980), in which the court held that the harmless error rule is the "standard most compatible with this Court's view of its own criminal appellant jurisdiction." The court went on to explain:
Whether there is a reasonable possibility that the constitutional error complained of might have contributed to the conviction is a question of law to which our appellate jurisdiction extends.
391 So. at 421.
The court adopted the federal standard of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), rehearing denied, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967). LSA-C.Cr.P. art. 921 provides:
A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.
We think the refusal of the requested jury charge was harmless error beyond any reasonable doubt. In both his argument and his evidence, defense counsel rejected the true defense of compulsion. His whole defense theory was to use Holmes's dubious statement about being forced at gunpoint to commit the robberies, merely to bolster the insanity defense. He never sought to convince the jury that Holmes was actually compelled to rob; rather, he tried to convince them that Holmes was hallucinating, and that the compulsion he felt, though imaginary, was real to him.
Specifically, counsel in his opening statement did not contend that Holmes was forced to commit the robberies. In his closing statement, he emphatically told the jury that he thought no one pulled a gun on Holmes; there was no compulsion. The requested jury instructions would have contradicted counsel's own argument. Furthermore, counsel's questioning of every witness sought to deprecate the evidence of compulsion. This was most pronounced with Ms. Brackman and Ms. Brownlee. Counsel persuaded them to admit that the gunman outside the Tiger Mart was probably imaginary.
Counsel's abandonment of the compulsion defense clearly distinguishes this case from State v. Miller, supra. In that case, the defense argued justification in opening statement and developed the theory through the case. 338 So.2d at 681. The present case is also distinguished from State v. Montalbano, supra, in which defense counsel admittedly did not plead or argue self-defense, but he certainly did not reject the theory. Under the circumstances of the instant case, an instruction on an abandoned defense would have confused the jury.
Defense counsel not only abandoned the compulsion defense, but repudiated it in favor of the insanity defense. Counsel sought to subordinate and exploit the evidence of compulsion in favor of a theory of insanity. He asked every medical expert to opine whether an imaginary gunman would be consistent with the diagnosed condition of schizophrenia or psychosis. With the exception of Dr. Jiminez, every expert conceded this assumption. The thrust of the defense was to prove that anyone who dreamed up imaginary, terrifying gunmen must be, by induction, crazy.
*1190 In addition to these considerations, we feel that the hard evidence of compulsion was very meager indeed. Had counsel wanted to keep the compulsion defense viable, he could have developed it, much as he attempted to develop the brawl story with the witness Ishmell Clinton.
Paucity of evidence is not, in itself, grounds for refusing the requested instruction. State v. Miller, supra. But we think it is harmless error when it is an extreme paucity of evidence, coupled with a defense theory that not only rejects the defense of compulsion but exploits the meager evidence to buttress the defense of insanity. The purpose of this theory was to discredit the evidence as proof of compulsion and drive it out of the jury's mind except as an element of the insanity defense; we think it succeeded.
We accordingly conclude this assignment lacks merit.

ASSIGNMENT NO. 6
In his final assignment of error, appellant claims the trial court imposed an excessive sentence and failed to particularize the sentence to the individual.
The sentencing court must comply with the mandatory guidelines of LSA-C.Cr.P. art. 894.1 and individualize the sentence by stating for the record the considerations taken into account and their factual bases. State v. Jones, 381 So.2d 416 (La.1980). It is axiomatic that the trial court has great discretion in imposing sentences and we will not upset one absent a clear abuse of this wide discretion. State v. Trahan, 425 So.2d 1222 (La.1983).
The trial court need not articulate every aggravating and mitigating circumstance outlined in article 894.1, provided he adequately consider those guidelines in particularizing the sentence to the defendant. State v. Smith, 433 So.2d 688 (La.1983); State v. Hammonds, 434 So.2d 452 (La. App. 2d Cir.1983), writ denied 439 So.2d 1074 (La.1983); State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir.1983), writ denied 438 So.2d 1112 (La.1983).
Before imposing the sentences, the court noted appellant's prior conviction for simple burglary. This classifies him as a second felony offender. The court further noted appellant's two outstanding armed robbery charges, which have not yet been brought to trial. The court finally noted the considerable evidence that appellant had malingered to avoid trial. These factors justify imposition of a sentence under article 894.1.
The court proceeded to list, without elaboration, the mitigating factors; none applied. We think the record as a whole clearly illuminates this sentencing choice. See State v. Smith, 430 So.2d 31 (La.1983). Only one mitigating factor could possibly apply: that appellant's mental condition tended to excuse or justify the conduct, while not constituting a defense.
The court gave this factor implicit consideration in imposing a sentence of less than one half appellant's total exposure. Appellant could have received as many as ninety nine, and as few as five, years on each offense. Armed robbery is a non-parollable offense. Furthermore, appellant could have received consecutive sentences.
A sentence within the statutory limits may nevertheless be constitutionally excessive. LSA-Const. Art. I § 20; State v. Sepulvado, 367 So.2d 762 (La.1979). The sentences imposed, though long, do not seem needless and purposeless, but rather appear necessary to protect society from appellant's erratic behavior. Appellant has not only perpetrated two serious offenses; he appears to have feigned mental illness for several years in order to avert his day of reckoning. Under these circumstances, the sentences are commensurate with the offenses and do not shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980); State v. Bosley, 454 So.2d 1245 (La.App. 2d Cir.1984).
This assignment lacks merit.
For the reasons expressed, appellant's convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.