562 So.2d 468 (1990)
STATE of Louisiana
v.
Julius MARTIN.
No. 88-KA-893.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1990.
*469 John M. Mamoulides, Eric Honig, Dorothy A. Pendergast, Office of Dist. Atty., Parish of Jefferson, Gretna, for plaintiff-appellee.
Martin E. Regan, New Orleans, for defendant-appellant.
Before GAUDIN, GRISBAUM and GOTHARD, JJ.
GAUDIN, Judge.
Julius Martin was tried in the 24th Judicial District Court for first degree murder in April, 1988. The jury unanimously returned a lesser, responsive verdict, guilty of manslaughter. On April 21, 1988, Martin was sentenced to 21 years at hard labor. For the following reasons, we affirm his conviction and sentence.
The victim, Carl Williams, was tied up, doused with gasoline and set on fire on December 19, 1987. He ultimately died ten days later of pneumonia brought on by second and third degree burns over almost all of his body.
Martin testified that Philip Henderson killed Williams at his (Williams') residence following a money dispute. Henderson, the prosecution's major witness, said otherwise. Henderson stated that it was Martin who tied Williams up, poured gasoline on him and set him on fire. Martin's testimony and Henderson's were in direct and almost total conflict.
Martin said that on the night in question, he went to Williams' residence. There, he found Williams and two women smoking cocaine. The two women left and Henderson arrived. He (Henderson) asked Williams to pay off a debt but that Williams said he had paid all of his money to Martin. Henderson then said, according to Martin: "If you give Rickey that money, I'm going to kill both of you." Martin's nickname is "Rickey."
A very short time later, when Henderson went into the bathroom, Martin said, he (Martin) ran from the house. As he proceeded down the street, Martin stated, he heard shots being fired at him.
Henderson's testimony differed substantially. He said that Martin made him (Henderson) lie on the floor and ordered Williams to tie him up. Once Henderson was secure, Martin forced Williams to the floor and he tied him up. As Martin poured gasoline on the tied-up men, Henderson said, he (Henderson) was able to free himself. He tried to hit Martin with a lamp. Henderson said that Martin fired his .38 pistol at him, hitting him in the arm.
According to Henderson, Martin set fire to toilet paper and threw it on Williams, setting him aflame. Martin then exited and started running down the street.
Henderson said that he went to his automobile and took his gun from the trunk. He shot at the fleeing Martin but missed.
Williams, meanwhile, had gotten up and made a telephone call, dialing 911. *470 Williams then walked from the house where he was given a shirt and blanket by Fred Brown, who had been walking nearby when he saw Martin running from Williams' house. Williams told Brown that he did not know why Martin had set him on fire and shot Henderson.
Obviously, the jury did not believe Martin's testimony and convicted him of manslaughter. On appeal, Martin assigns three district court errors:
(1) the trial judge erred in prohibiting evidence of Henderson's past violent crimes,
(2) the hearsay statements of the victim were wrongly permitted, and
(3) the trial judge should have allowed the defense to view and use for impeachment and/or other purposes Henderson's grand jury testimony.

ASSIGNMENT NO. 1
In this assignment of error, appellant contends that while the trial judge permitted testimony of Henderson's violent acts against him, he was wrong in not allowing evidence of Henderson's prior acts of violence toward others. The evidence sought to be introduced consisted of two incidents. In 1975, Henderson shot and killed a 17-year-old person. A no true bill was returned by the grand jury. In 1986, Henderson shot another man. The grand jury again returned a no true bill, finding that Henderson acted in self-defense.
Martin argues that the disallowed evidence of Henderson's dangerous character was relevant to show the state of mind of the parties, particularly Martin's state of mind and to negate the inference of guilt regarding his (Martin's) flight to Florida. Martin said he went to Florida after Williams was set on fire not because he felt he was guilty but because he was fearful of Henderson.
LSA-R.S. 15:482, in effect at the time of this trial, provides that in the absence of evidence of a hostile demonstration or of an overt act on the part of the person slain or injured, evidence of his dangerous character or his threats against the accused is not admissible. See State v. Edwards, 420 So.2d 663 (La.1982), and State v. Lee, 331 So.2d 455 (La.1976).
For purposes of this discussion only, it is presumed that Henderson was a victim and that the procedural dictates of Title 15 apply. The only evidence of Henderson's hostile demonstration or overt act was Martin's uncorroborated testimony that Henderson threatened to kill him and Williams. Was this sufficient to meet what Louisiana courts have called the "appreciable evidence" test? In State v. Edwards, supra, and State v. Lee, supra, the Supreme Court of Louisiana found evidence sufficient to meet this test. In State v. Sylvester, 438 So.2d 1277 (La.App. 3 Cir. 1983), writs denied at 444 So.2d 606 (La. 1984), however, the district judge evaluated evidence strikingly similar to that presented by Martin in the case now before us and held that the "appreciable evidence" test had not been met. From Sylvester at page 1280:
"In the instant case, the `overt act' or `hostile demonstration' alleged by the defendant is his claim that as he was talking with the victim, who was seated in her car, she told him that she was going to kill him, then turned and picked up a gun and pointed it at him. The sole evidence to support this version is defendant's own testimony. There were no eyewitnesses who could corroborate this, and the physical evidence conflicts with defendant's testimony as well. The defendant has failed to meet the `appreciable evidence' test. The trial court properly refused to allow defendant's testimony concerning prior specific threats by the victim against the defendant."
Here, we cannot say the trial judge erred in finding that Martin's testimony, standing alone and generally in sharp conflict with other testimony and evidence, did not meet the "appreciable evidence" test.
We further note the following. Assuming arguendo that Martin did meet the "appreciable evidence" test, two types of evidence would then be permitted: (1) evidence of a victim's dangerous character and/or (2) evidence of his threats against *471 the accused. The trial judge did allow evidence of Henderson's alleged acts against Martin and he and the jurors did listen while Martin said what state his mind was in after the crime occurred.
The trial judge refused, on the other hand, to permit evidence of Henderson's acts against third persons, acts which Martin wanted to introduce to show Henderson's bad character. A showing of bad character would depend on the reputation a person has, not upon specific acts. See State v. Bryan, 398 So.2d 1019 (La. 1980), particularly footnote 4 at page 1022. Thus, evidence of Henderson's no true bill incidents in 1975 and 1986 would not have been proper to show bad character.
It appears clear that Martin was convicted of this crime because the jury found Henderson's testimony and other evidence more credible than the defendant's version. Flight was not a meaningful consideration.

ASSIGNMENT NO. 2
During the trial, the district judge admitted, over objection, the statement of an investigating police officer taken from Williams in the emergency room of Ochsner Hospital and a recording of a 911 call made by the victim. Both were admitted as dying declarations, which are exceptions to the hearsay rule. Martin contends these admissions constitute reversible error.
Williams was taken to the emergency room where he was treated by Dr. Frances Smith. Williams was in a critical condition with surface wounds over most of his body and inhalation burns. A police officer, Sam Brocato, spoke with Williams and wrote down what he said while Dr. Smith initiated burn treatment. Because Williams was critically ill, the Brocato statement was brief and unsigned by Williams.
Brocato testified that Williams said that Martin tried to rob him and Henderson and that Martin tied him up and poured gasoline on him. Appellant objects to this testimony as a dying declaration because of an insufficiency of evidence showing that Williams knew he was going to die, an essential element of the dying declaration exception. See State v. Verrett, 419 So.2d 455 (La.1982), and State v. Vincent, 338 So.2d 1376 (La.1976). However, the declarant need not express this belief in direct terms; the required state of mind may be inferred from the course of events leading up to the making of the declaration and other pertinent considerations. In State v. Verrett, supra at page 457, the Supreme Court, stated:
"We do not believe it is sacramental that the victim declare that he feels the end is near if such belief may be reasonably presumed from the facts and circumstances surrounding the declaration ... In this connection we note, as a reasonable conclusion, that the more serious the injury and impairment of the declarant's physical condition, the more probable is his belief that the end is near ...
"We conclude that, as a matter of law, the statement should not be excluded simply because no words were uttered by the declarant indicating an awareness of his impending demise ..."
Williams never actually said that he knew his condition was fatal, but Dr. Smith testified that she believed Williams "... was fully aware that he was critically injured." The trial judge asked Dr. Smith whether she thought Williams could anticipate or feel that he was in danger of death. Dr. Smith answered: "Yes, your honor."
The trial judge relied mainly on Dr. Smith's testimony in finding that what Williams told the police officer was a valid dying declaration. Dr. Smith said that Williams was alert, oriented and frightened. Dr. Smith stated that Williams kept screaming for help and that she (Dr. Smith) told Williams that he had been seriously hurt.
The 911 telephone call was made by Williams moments after Henderson left the house in pursuit of Martin. During the course of this conversation, Williams identified Martin as the person who had set him on fire. The 911 telephone call was part of the res gestae and therefore admissible. In State v. Huizar, 414 So.2d 741 (La.1982), res gestae was described as "... events *472 which speak for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants." What forms any part of the res gestae is always admissible in evidence.
Further, the 911 telephone call was properly admitted as an excited utterance exception to hearsay. See State v. Krolowitz, 407 So.2d 1175 (La.1981), and State v. Henderson, 362 So.2d 1358 (La.1978). In Henderson at page 1362, the Supreme Court said:
"One of the traditional common law hearsay exceptions recognized by this Court is the exception for certain statements made under the influence of a startling event. Formulations of the exception differ, but all courts agree on two basic requirements. There must be an occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative. Additionally, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought."
It appears, from all accounts, that Williams' 911 telephone call, if not a true dying declaration, was part of the res gestae and also that it was spontaneous and not the result of reflective thought. There was not enough time for Williams' emotions to have subsided.
After making the emergency telephone call, Williams tried to walk out of his house where he was met by Brown, a neighbor. Brown testified that Williams was naked, all of his clothes having been burned off, and that he (Brown) located a blanket and draped it over Williams. Williams said, according to Brown, "I don't know why Rickey did this," and added: "Rickey ... tied us up and poured gas on us and shot Phil and left the house."
Defense counsel made no objection to Brown's testimony, perhaps feeling that it fell within the res gestae exception to hearsay.
We find that the trial judge, considering Dr. Smith's testimony and other facts and circumstances showing the extreme seriousness of Williams' burn injuries, did not err in allowing the police officer to say what Williams said in the emergency room; and we also find the trial judge was correct in allowing the 911 telephone call recording to be introduced, as part of the res gestae or as an excited, spontaneous utterance if not as a dying declaration.
If the trial judge erroneously admitted the emergency room declaration or the 911 telephone call recording, such error or errors was not of sufficient magnitude to mandate a reversal of Martin's conviction. The testimony of Henderson and Brown and other evidence fully support the jury verdict.

ASSIGNMENT NO. 3
Martin argues, in this assignment of error, that the trial judge mistakenly denied him access to and possible use of Henderson's grand jury testimony, which allegedly varied from what this witness had told police officers during the investigation of this crime. See State v. Peters, 406 So.2d 189 (La.1981), which directs the trial judge, under certain circumstances, to make an in camera inspection.
The trial judge here did make an in camera inspection, searching for possible inconsistencies pointed out by Martin's attorney. The trial judge did find that there was an inconsistency in Henderson's testimony regarding the type of pistol Martin had. This inconsistency was not major and Henderson was cross-examined at length on this point.
Also, Henderson admitted at trial that he did not tell investigating police officers that he fired shots at the fleeing Martin and that this, Henderson said, was a mistake. Henderson said he was afraid of prosecution if he revealed that he had fired a pistol within city limits. Henderson was also cross-examined about this.
In any event, the trial judge's in camera inspection failed to turn up any exculpatory evidence, and he so informed Martin's counsel.
*473 Concluding, we find no substance in Martin's assignments of error and there are no errors patent except the fact that the trial judge failed to give Martin credit for time served when passing sentence. Inasmuch as the minute entry of the sentencing and also the commitment documents do give Martin the credit he is entitled to, there is no need to remand for resentencing.
AFFIRMED