746 So.2d 95 (1999)
STATE of Louisiana
v.
Deaudre HESTER and Jimmie Patterson (sentenced as "Jimmie L. Patterson").
No. 99-KA-426.
Court of Appeal of Louisiana, Fifth Circuit.
September 28, 1999.
*98 Katherine M. Franks, Louisiana Appellate Project, Baton Rouge, Louisiana, Attorney for Defendants-Appellants, Deaudre Hester and Jimmie Patterson.
Paul D. Connick, Jr., District Attorney, Alison Wallis, Terry M. Boudreaux, Ron A. Austin, David Wolff, Assistant District Attorneys, Gretna, Louisiana, for State.
*99 Court composed of Judges CHARLES GRISBAUM Jr., EDWARD A. DUFRESNE and SUSAN M. CHEHARDY.
CHEHARDY, Judge.
Deaudre Hester and Jimmie Patterson appeal their convictions and sentences. Both defendants were convicted of aggravated kidnapping and armed robbery. Hester also was convicted of aggravated rape and aggravated crime against nature. Both received lengthy consecutive sentences. We affirm the convictions and the sentences.

FACTS
At 11:30 p.m. on October 9, 1997, Leslie Mack was lying on a sofa watching television at her apartment on Houma Boulevard in Metairie. Her husband, Hardell Mack, had gone out to return a rented videotape. Suddenly three African-American men (later identified as Jimmie Patterson, Deaudre Hester, and Alex Henderson) kicked in the front door and entered the residence. Ms. Mack testified that she did not know the men. She reached for a nine-millimeter Smith and Wesson handgun lying next to the sofa, but the intruders all had guns trained on her. They ordered her to drop the handgun and she complied.
The three men demanded money. They asked Ms. Mack whether there was a safe in the apartment. She responded that there was no safe, but that she had money in her purse. The men then took the money from her purse and ransacked the bedroom in search of more cash. They took jewelry and other items belonging to the Macks and told Ms. Mack to lie on the floor. She refused, believing the men intended to shoot her. She told them she was pregnant and begged them not to harm her.
The intruders left the apartment, forcing Ms. Mack to go with them. They put her into the back seat of a red Pontiac Grand Prix automobile. Patterson sat in the back seat with her. Hester drove the car, while Henderson rode in the front passenger seat. The men demanded more money. Ms. Mack told them that she thought her husband kept money at his grandmother's house on Upland Street in River Ridge. She testified at trial that there was no such money and that she told her abductors that in order to buy time. The men took Ms. Mack to the Upland Street residence, continually threatening to shoot her.
Patterson accompanied Ms. Mack to the door of the Upland Street residence, where Hardell Mack's grandfather let them into the house. Ms. Mack asked Hardell's cousin, Ronald Bardell, if he would help her to look for something, but did not specify what it was she was looking for. She started taking things out of a closet. Bardell testified that she was nervous and close to tears. At one point she declared, "I can't find it." Patterson turned to leave the house and Ms. Mack followed. She turned to Bardell and told him to "call the cops." After Ms. Mack and Patterson had gone, Bardell woke his grandmother and they called police.
Upon leaving the Upland Street house, the perpetrators put Ms. Mack back into the car and covered her face with a T-shirt. They took her to the London Lodge Motel on Airline Highway in New Orleans. Patterson and Henderson left the room after ordering Hester to stay there and guard Ms. Mack. Before leaving the room, Henderson told Hester, "Don't try none of that funny stuff. I ain't down with that."
There were two beds in the room. Ms. Mack and Hester each sat on one. At one point Hester began talking to Ms. Mack. He started with mundane topics. After a while he told her, "I know where you work at. I know you was a hairdresser. We know a whole lot about y'all." He eventually made her perform oral sex on him. Ms. Mack testified that she resisted Hester and that during the act she could feel him pointing a gun to her head.
*100 Hester ordered Ms. Mack to take down her pants. She began to cry and Hester said, "Oh, you're trying to get loud on me. I'll shoot you right here." He then pulled down her pants and had intercourse with her. Afterward he ordered her to put on her clothes. She complied, then she sat on one of the beds again. Hester approached her and began to rub her stomach, then returned to the other bed.
Patterson and Henderson returned to the motel room. They demanded that Ms. Mack tell them her husband's cellular telephone number. The men then took all the jewelry she was wearing, including her wedding ring. At that point Hester and Henderson left the room, while Patterson stayed to guard her. Patterson lay on the bed and fell asleep. Ms. Mack testified that she lifted the tee shirt and looked at him. At one point she picked up Patterson's gun, pointed it at him, and pulled the trigger. The gun did not fire, so she threw it back on the bed. Hester and Henderson knocked on the door at that point and she awoke Patterson to tell him his companions had returned.
When Hester and Henderson returned to the motel room, the three perpetrators took Ms. Mack to their car. The victim testified that they rode around for some time, then the men dropped her off in an alley. Ms. Mack called for help from a nearby home, and police went to her assistance.
Shortly after Ms. Mack's abduction Mr. Mack returned to his apartment and found the door off its hinges. He asked a neighbor to call police. Officers responded quickly. Deputies checked the inside of the apartment and found the master bedroom in great disarray. Mr. Mack reported to officers that his nine-millimeter Smith and Wesson gun was missing. Mr. Mack also reported that there was cash missing from the house. The gun's serial number was later recorded in the NCIC computer.
Approximately ninety minutes after he discovered his wife missing, Hardell Mack received a call on his cellular telephone. The caller, who did not identify himself, told Mack he had his wife and demanded that Mack turn over $60,000 if he wanted to see her alive. Mr. Mack responded that he did not have access to that much money. The caller told him, "You think I'm playing?" then ended the call.
Detective Deborah Labit of the Jefferson Parish Sheriffs Office testified that the Caller ID feature on Mr. Mack's telephone allowed officers to trace the call to a convenience store on Jefferson Highway.
The same man called a second time. Mr. Mack told him he could pay $40,000. The caller ordered him to put the money in a black bag and drop it off at a Circle K convenience store on Airline Highway, just inside Orleans Parish. Mr. Mack obtained a black bag as instructed, but filled it with miscellaneous items instead of money. He drove his wife's car to the Circle K store and dropped the bag in a trash can as he had been directed by the caller.
Two deputies rode in the car, hidden under blankets, while Jefferson Parish Sheriffs Office undercover agent Jason Renton posed as a clerk inside the store. Agent Renton testified that a man wearing a blue bandanna approached the store four or five times. The man did not go to the trash can, but stared at Renton. A man later identified as Ernest Birden picked up the bag and sat on the curb with it. Birden opened the bag and saw there was nothing of value in it. Renton saw the man with the bandanna approach again and suspected he was involved in the abduction. Renton went to Birden and asked whether the bag belonged to him. When Birden responded that it did not, Renton took the bag away and returned it to the trash can. He ordered Birden to leave the premises and the man complied. The man with the blue bandanna also left the area.
After making the drop, Mr. Mack received another call. The caller accused him of talking to police, and indicated that *101 he knew the bag did not contain money. The man called again fifteen minutes later and ordered Mr. Mack to drop the ransom money on Palmetto Street in New Orleans. Mack dropped off the bag (which again contained no money) as directed.
Detective Sergeant Terry Graffeo Sr. of the Jefferson Parish Sheriffs Office testified that after the second "drop," two subjects picked up the bag. They were detained and transported to the New Orleans Police Department's headquarters for questioning. After interviewing them, Graffeo determined they were not involved in the abduction. They had picked up the bag believing it belonged to an acquaintance of theirs. The two were released from custody.
After Ms. Mack telephoned police, Detective Labit and other officers found her on Bernadotte Street near Conti Street in New Orleans. Ms. Mack was transported to Charity Hospital in New Orleans, where emergency medicine physician Dr. Toni Denson performed a rape examination. The doctor used a standard rape kit to collect oral and vaginal samples from the victim. Dr. Denson also determined Ms. Mack was eight to ten weeks pregnant.
On the night of the abduction, Detective Graffeo went to the Circle K on Jefferson Highway, where the first call to Mr. Mack was placed. He spoke to the clerk on duty, Kesha Bennett, who told him she had seen two men use the phone outside the store. The men thereafter entered the store and borrowed a pen from her. They left the store without buying anything. Ms. Bennett showed Graffeo the store surveillance tape, pointing out the two men. The tape displayed the date and time, although Ms. Bennett pointed out the time was off by one hour. Still photographs of the two men were later made from the tape.
Agent Renton returned to the Circle K store on Airline Highway at about midnight on October 20, 1997 as part of the follow-up investigation in this case. He encountered Ernest Birden there. He questioned Birden about the black bag, but the man was not cooperative. When Renton told Birden that he was investigating a kidnapping and rape, Birden's attitude changed. He told Renton that a man named "Cubby," who lived on Cherry Street, was involved. Renton then reviewed police computer records and found that Alex Henderson used the name Cubby as an alias and that he lived on Cherry Street. Birden later identified Henderson from surveillance photographs.
Detective Sergeant Kelly Jones of the Jefferson Parish Sheriffs Office personal violence division compiled a photographic lineup which included a picture of Henderson. She presented the lineup to Ms. Mack on October 20, 1997 and Ms. Mack positively identified Henderson as one of her abductors. Detective Jones obtained an arrest warrant for Henderson, but Henderson was still at large at the time of trial.
Detective Wilkie Declouet of the Jefferson Parish Sheriffs Office interviewed Birden and, as a result, he developed Deaudre Hester as a suspect. Jones showed Ms. Mack two photographic lineups, each of which contained a picture of Hester. Ms. Mack positively identified Hester from both lineups as one of her abductors. Declouet thereafter set up a surveillance on Hester's car and arrested him when he appeared.
Detective Jones testified that she worked with the New Orleans Police Department to obtain search warrants for Hester's and Henderson's residences in Orleans Parish. Searches conducted at those homes did not uncover anything of evidentiary value. A search of Hester's car, a red Pontiac Grand Prix, also netted nothing. Based on information Ernest Birden gave to police about a subject named "Little," Detective Jones went to 9009 Olive Street in the Holly Grove area. She found an Elizabeth Patterson there, who told her she did not know anyone called "Little."
*102 On October 28, 1997, Corporal Randoll Joseph of the St. John the Baptist Parish Sheriffs Office was on patrol in Reserve when he stopped a black Cadillac with an expired Texas license plate. The driver of the car was Jimmie Patterson, who did not have a driver's license. Corporal Joseph looked through a car window and saw an automatic weapon lying on the floorboard. He placed Patterson under arrest and searched the inside of the car. Corporal Joseph found two additional handguns in the arm rest between the front seats, one of which was the Smith and Wesson ninemillimeter handgun registered to Mr. Mack. The Jefferson Parish Sheriffs Office was later notified that the gun had been recovered.
Detective Jones testified that when Patterson was arrested he gave his address as 9009 Olive Street, the address where officers had looked for the subject known as "Little." Detective Jones compiled a photographic lineup which included a picture of Patterson. She showed the lineup to Ms. Mack, who identified Patterson as one of her abductors. Ms. Mack also identified Hester and Patterson in court.
Patricia Daniels of the Orleans Parish Coroner's Office, an expert in the detection and analysis of bodily fluids, testified that she analyzed samples from the victim's rape kit. Internal and external vaginal swabs were both positive for seminal fluid. An internal microscopic slide was also positive for spermatozoa.
In May of 1998 Detective Jones obtained a search warrant for Hester's person. She used it to obtain blood, saliva, head and pubic hairs from him. Christine Kogos of the Jefferson Parish Crime Lab sent those samples, along with samples obtained during the victim's rape exam, to ReliaGene Technologies for DNA testing. Kogos also sent a piece of the bedspread from the London Lodge Hotel to ReliaGene after a Lumalight showed evidence that the bedspread was stained with seminal fluid.
Julie Golden, a forensic scientist with ReliaGene, testified that she performed DNA testing on some of the samples collected in this case. Ms. Golden determined that the DNA extracted from the seminal fluid found in the victim's vaginal swab was consistent with the samples taken from Hester. She also found that the DNA extracted from the bedspread was not consistent with either the victim's or Hester's known samples.
On December 18, 1997 the Jefferson Parish Grand Jury issued a four-count bill of indictment against Deaudre Hester and Jimmie Patterson. Count 1 charged the defendants with violation of La. R.S. 14:64, armed robbery, and Count 2 charged both defendants with violation of La. R.S. 14:44, aggravated kidnaping. Counts 3 and 4, respectively, charged only Hester with violation of La. R.S. 14:42, aggravated rape, and of La. R.S. 14:89.1, aggravated crime against nature.[1]
Both defendants entered pleas of not guilty. Hester filed a motion to quash, alleging that the proper venue for the aggravated rape charge was Orleans Parish rather than Jefferson Parish. The motion was denied and Hester's writ application seeking review of that ruling also was denied.
The defendants were tried together on January 12 through 15, 1999. On January 15, the jury found both defendants guilty on all counts against each of them. The court declared the verdicts valid after polling the jury.
Patterson's motion for new trial was denied on January 27, 1999. Patterson waived statutory sentencing delays and the court sentenced him that day to thirty years at hard labor on Count 1 and to a mandatory term of life imprisonment at hard labor on Count 2. The court ordered that the sentences be served consecutively *103 and without benefit of parole, probation or suspension of sentence.
Hester filed a motion in arrest of judgment and, alternatively, a motion for new trial on January 27, 1999 and both motions were denied on that day. Hester indicated he was ready for sentencing, thereby waiving statutory delays. The court sentenced him to twenty years at hard labor on Count 1, to mandatory life terms at hard labor as to Counts 2 and 3, and to seven years on Count 4. The court ordered that the sentences be served consecutively and without benefit of parole, probation or suspension of sentence.
The defendants both made timely motions for appeal.
ASSIGNMENT OF ERROR NO. 1
The consecutive sentences were not specifically justified by the court and made the sentences imposed upon both appellants cruel and excessive. The imposition of sentences in excess of a natural life span, without special justification, are so "cruel and unusual" as to fall within the parameters of the constitutional prohibition.
[Hester and Patterson]
By this assignment, both Hester and Patterson charge that their sentences are excessive. We note, first, that the record shows no evidence that either defendant filed a written motion to reconsider sentence under the provisions of La. C.Cr.P. art. 881.1. Both defendants made oral objections at the time of sentencing, but those objections were not specific enough to satisfy the requirements of the article. Patterson's attorney simply said, "[P]lease note my objection to the excessiveness of the sentences...." Hester's counsel stated, "Note my objection to the sentencing, Your Honor."
The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness. See State v. Williams, 97-970 (La.App. 5 Cir. 1/27/98), 708 So.2d 1086; State v. Curtis, 97-769 (La.App. 5 Cir. 2/11/98), 707 So.2d 1328. Accordingly, we examine the defendants' sentences only for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992). Even a sentence which falls within statutory limits may be excessive under certain circumstances. State v. Robicheaux, 412 So.2d 1313 (La.1982). Once imposed, a sentence will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within statutory limits. State v. Carter, 96-358 (La.App. 5 Cir. 11/26/96), 685 So.2d 346.
Defendants' chief complaint is that the trial court erred in ordering that their sentences run consecutively, as consecutive sentences are not supported by the record. Although we deem this an issue which need not be addressed in a review for bare constitutional excessiveness, in any case defendants' argument has no merit.
La.C.Cr.P. art. 883 provides, in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.
The instant offenses were all part of the same transaction. There was, *104 therefore, a presumption in favor of concurrent sentences under the article. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Such sentences are justified when the offender poses an unusual risk to public safety. State v. Johnson, 97-867 (La.App. 5 Cir. 4/15/98), 711 So.2d 848, writ denied, 98-1293 (La.10/9/98), 726 So.2d 20. Although the trial judge in the instant case did not specifically state his reasons for imposing consecutive sentences, the record shows that the judge based the penalties on the serious nature of the crimes involved.
In his reasons for Patterson's sentence, the trial judge stated:
The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution under the supervision of the State of Louisiana. Any lessor [sic] sentence which the Court will not sentence the defendant to would depreciate the seriousness of the defendant's crime. The Court further takes notice that the offense before the Court was committed while the defendant was in possession of a dangerous weapon and that actual violence was used in the commission of the offense.
The judge made a similar statement in imposing Hester's sentence.
The record supports the trial court's reasons. Defendants participated in a virtual crime spree. They invaded the Macks' apartment, taking money and valuables. They then held Ms. Mack for hours, continually threatening to kill her if they did not receive more money. Hester sexually assaulted the victim twice at gunpoint, then abandoned her in an unfamiliar neighborhood.
Defendants argue that they did not physically harm Ms. Mack and were not deliberately cruel. On the contrary, her trial testimony shows that she suffered a great deal of distress. The record shows she was pregnant at the time of the offenses and that she so informed defendants. She was forced to spend the entire ordeal worrying for her own safety as well as that of her unborn child. The trial court further noted that Patterson had two prior felony convictions. The judge did not abuse his discretion in making defendants' sentences consecutive.
Both aggravated rape (La. R.S. 14:42) and aggravated kidnapping (La. R.S. 14:44) carry mandatory life sentences. This Court has found that the mandatory life sentence for aggravated rape is a valid exercise of the Legislature's prerogative to determine the length of sentence for crimes classified as felonies. State v. Lewis, 98-672 (La.App. 5 Cir. 3/10/99), 732 So.2d 556. Similarly, the court in State v. Roberts, 31,219 (La.App. 2 Cir. 9/23/98), 718 So.2d 1057, found a life sentence for aggravated kidnapping was not disproportionate to the seriousness of the offense.
The armed robbery sentences of 30 years for Patterson and 20 years for Hester are well below the statutory maximum of 99 years. La. R.S. 14:64. Likewise, Hester's sentence of seven years for aggravated crime against nature was well below the statutory maximum of 15 years. La. R.S. 14:98.1.
Based on the aforementioned facts and circumstances, we find no abuse of the trial court's wide discretion in making the sentences consecutive, nor in the lengths of the non-mandatory sentences.
ASSIGNMENT OF ERROR NO. 2
The trial judge erred in allowing the unsworn statements of a deceased prosecution witness to be admitted into evidence over the objection of the defense.
[Hester and Patterson]
By this assignment, defendants complain that the trial court erred in allowing the admission of statements made by Eric Birden to Agent Jason Renton *105 during the kidnapping investigation. (Birden was deceased at the time of trial.) Defendants argue that the court's error entitles them to a new trial.
Agent Renton testified at trial that during his surveillance at the Circle K on Airline Highway on the night of the incident, he saw Eric Birden pick up and inspect the black bag that Mr. Mack had left in a trash can for the kidnappers. Renton said Birden appeared to be a "homeless gentleman." Renton returned the bag to the trash can and ordered Birden to leave the area. Birden complied. One of the kidnappers then telephoned Mr. Mack to say that he knew the bag did not contain any money, but only a tape and a battery. The fact that the caller knew exactly what was in the bag led Renton to conclude that Birden had made contact with the perpetrators.
Renton testified that he returned to the Circle K during the course of the follow-up investigation and saw Birden there. The agent attempted to question Birden about the perpetrators. At first Birden was not forthcoming, but when Renton informed Birden that the perpetrators were actually involved in a kidnapping and rape, Birden became very upset and agitated.
The State attempted to elicit testimony from the agent as to the information Birden gave him. Patterson's attorney objected to the line of questioning. The State countered that the testimony was admissible under the "excited utterance" exception to hearsay.
In arguing the issue the State disclosed, out of the jury's presence, that the perpetrators told Birden the bag contained money from a drug deal and that they offered to pay him to retrieve it for them. When Renton told him that the perpetrators had actually been involved in a kidnapping and rape, Birden stated, "That's fucked up what they did that woman." The State contended that Birden's statement was a response to his emotional upset over finding he had been involved with kidnappers. The trial court ruled that the testimony was admissible as an excited utterance, relying on this Court's decision in State v. Martin, 562 So.2d 468 (La.App. 5 Cir.), writ denied, 566 So.2d 987 (La.1990).
Renton then testified before the jury regarding Birden's reaction upon being informed about the kidnapping, stating that Birden's reference to "they" led him to believe more than one individual took part in the abduction. Renton testified that Birden told him a person named "Cubby" was involved, and that he lived on Cherry Street. The agent ran that alias on the police computer. Among the thirty black males listed as "Cubby" was Alex Henderson, who resided on Cherry Street. Birden was shown photographs from the Circle K's surveillance camera, and identified Henderson as one of the two men pictured.
Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. La. C.E. 801(C). Hearsay testimony is generally inadmissible. La. C.E. art. 802. A police officer, in explaining his own actions, may refer to statements made by others, not to prove the assertion, but to explain his actions in investigating the case. Where the officer does not testify to the substance of what another person told him, but to what he did in response to that information, the testimony is not considered hearsay. State v. Smith, 97-1075 (La.App. 5 Cir. 4/15/98), 710 So.2d 1187.
In the instant case, the trial court allowed Agent Renton to testify as to the specifics of what Eric Birden told him. The agent's testimony was therefore hearsay.
Article 803(2) of the Louisiana Code of Evidence provides that an excited utterance is admissible as an exception to hearsay and defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This *106 exception requires an event sufficiently startling to render a declarant's normal reflective thought process inoperative. Further, the statement of the declarant must have been a spontaneous reaction to the event and not the result of reflective thought. State v. Rhodes, 29,207, p. 8 (La.App. 2 Cir. 1/22/97), 688 So.2d 628, 634-635, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
In determining whether a statement was made under the stress of the startling event, the most important factor is time. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement is expanded beyond a description of events to include past or future facts, and whether the declarant performed tasks requiring reflective thought between the event and the statement. State v. Jasper, 28,187, p. 8 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, 563, writ denied, 97-0753 (La.9/26/97), 701 So.2d 980.
Given the circumstances surrounding Birden's statement to Renton, it is doubtful that the entire statement falls under the excited utterance exception. The court's ruling was apparently based on the premise that Birden's statement was the result of agitation over his discovery that he had unwittingly participated in an attempt to collect ransom money. Even if those circumstances are considered to have been sufficiently startling under article 803, only Birden's statement that "That's fucked up what they did that woman," can be said to have been responsive to the stress of the situation.
The information about "Cubby" was given in response to Renton's further questioning and was given after Birden had had time to reflect on the matter. Birden's statement can also be considered to have been self-serving. Renton himself testified that he perceived Birden to be concerned about whether he might be implicated in the kidnapping.
The circumstances surrounding Birden's statement are not similar to the facts in State v. Martin, supra, the case the trial court cited as authority for its ruling. In that case, the defendant set the victim on fire, and the victim died days later. At trial, a 911 telephone call, in which the victim identified the defendant as the man who had set him on fire, was admitted. The reviewing court found that the call was properly admitted as res gestae, and also as an excited utterance exception to hearsay. Unlike Birden's statement about "Cubby," the 911 call made by the victim in Martin was clearly a spontaneous response to a shocking and disturbing situation, and was not the result of calm reflection.
Even if the trial court erred in allowing Renton's hearsay testimony, however, the error is harmless. The specific testimony of which defendants complain did not concern them. Rather, it had only to do with Alex Henderson, who was not tried with defendants. Defendants do not show how the testimony prejudiced their cases.
While defendants are correct in their assertion that Birden gave officers further information which eventually led to their arrests, that information was not obtained as part of Birden's initial statement to Renton. Detective Declouet testified that he developed Hester as a suspect based on information Birden gave him. Detective Jones testified that she received a lead on the subject known as "Little" (who was later identified as Patterson) from information officers obtained from Birden. However, neither of those officers testified as to the substance of Birden's statements. Rather, their testimony went to show why they took certain actions in the investigation.
ASSIGNMENTS OF ERROR NOS. 3 AND 4
The trial judge erred in allowing Detective Graffeo to testify as to the *107 mis-set clock on the video surveillance tape and the fact that the store clerk told him the men had used the telephone, a fact not testified to by the clerk.
[Patterson and Hester]
The trial judge erred in allowing hearsay evidence as to the descriptions of the perpetrators into evidence when Ms. Mack did not give as complete descriptions in her testimony.
[Patterson and Hester][2]
Patterson first complains that Detective Graffeo's testimony as to statements store clerk Kesha Bennett made to him constituted prejudicial hearsay, as the officer's testimony went beyond what Ms. Bennett said in her own testimony.
Ms. Bennett testified that on the night of October 9, 1997, she worked the "graveyard" shift at the Circle K on Jefferson Highway. While she was on duty, two men entered and exited the store several times. At one point they asked her for a pen or pencil. She gave them a pen and they left the premises. Detective Graffeo testified that after one of the ransom calls was traced to that store, he went there and interviewed Ms. Bennett. The detective learned that there was a surveillance camera in the store. He viewed that night's tapes with Ms. Bennett, who pointed out the two men to whom she had given the pen. Although Ms. Bennett did not testify to having seen these men use the telephone outside the store, Detective Graffeo testified that she so informed him during his interview with her.
Ms. Bennett testified that the clock on the store's surveillance camera was one hour off that night. She identified several photographs of the two men taken from the surveillance tape. She stated that, although the time printed on the photographs was 12:40 a.m., the actual time would have been 1:40 a.m. Detective Graffeo subsequently testified that Ms. Bennett informed him about the mis-set clock. Patterson complains that Graffeo's testimony was inadmissible hearsay as it related to the clock's inaccuracy, but concedes that the error was harmless.
Although a statement may constitute inadmissible hearsay, if the statement is merely cumulative or corroborative of other evidence, the admission of such statement is harmless error. State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481.
Patterson next argues that Graffeo's testimony that Ms. Bennett saw the two subjects use the phone at the store was inadmissible hearsay. Defendant correctly asserts that this statement went beyond what Ms. Bennett said in her own testimony. However, Graffeo's testimony on that point was duplicative of Patterson's own statement to Detective Jones.
Jones testified that after his arrest Patterson waived his rights and consented to give a statement. He admitted to having been at the Circle K on Jefferson Highway with Alex Henderson. Patterson told Jones that Henderson borrowed a pen from the clerk, then went outside to use the telephone. Again, the hearsay testimony at issue was cumulative of other evidence. Its admission, therefore, constitutes harmless error.
For the foregoing reasons, it cannot be said that Patterson was prejudiced by Detective Graffeo's testimony.
Hester complains that the trial court erred in allowing Detective Jones to testify, over defense objection, to Ms. Mack's initial description of the perpetrators, when said testimony added more details *108 than were included in the victim's own testimony. Defendant refers to the following testimony by Detective Jones:
She [Ms. Mack] described all three subjects as being black males.
Subject number one she described as approximately five eight, five nine, heavy build, in his late twenties.
Subject number two she described as being six foot, six foot one, thin, approximately 150 pounds, with a light mustache, also in his twenties.
Subject number three she described as six foot, six foot one, probably 180 to 200 pounds, also in his twenties. She also said the last subject I described had some gold in his mouth.
Jones further testified that Ms. Mack told her the man with the gold teeth was the one who drove the car.
Ms. Mack testified that one perpetrator was short, and had an "Afro" hairstyle. Another was tall and skinny, with a "flat top" haircut. The third was "kind of built" and had "soft" hair. Ms. Mack identified Patterson in court as the skinny one; she identified Hester as the third subject and as the one who drove the car.
Jones' testimony was indeed hearsay to the extent that it was not cumulative of Ms. Mack's own testimony. As defendant claims, Ms. Mack did not testify at trial about a gold tooth. The testimony does not fall under La. C.E. art. 801D(1)(c), which provides that a statement is not hearsay if the declarant testifies at trial and the statement is "one of identification of a person made after perceiving the person." Ms. Mack gave the descriptions to Detective Jones before she made the photographic identifications and had nothing to do with an identification procedure.
Although it appears the trial court erred in allowing the testimony at issue, such error was harmless. Ms. Mack positively identified both defendants in photographic lineups as well as in court. She testified that she was absolutely certain Hester was the one who raped her. Given the certainty of Ms. Mack's identifications, it cannot be said that the jury's guilty verdict was attributable to Jones' testimony.
Accordingly, we find no merit to these assignments.
ASSIGNMENTS OF ERROR NOS. 5 AND 6
The trial judge erred in denying the Motion in Limine filed by Jimmie Patterson.
[Patterson]
The trial judge erred in allowing "other crimes" evidence to be admitted at trial.
[Patterson]
By these assignments, Patterson complains the trial court erred in allowing Corporal Randoll Joseph to testify that when he searched the car driven by Patterson, he found two guns in addition to the Smith and Wesson owned by Hardell Mack. Defendant terms the testimony inadmissible "other crimes evidence" and argues that it prejudiced his case.
Defendant filed a pre-trial motion in limine to prohibit introduction of evidence of other crimes or bad acts, in which he asked the court to exclude any evidence of the two additional guns, on the ground that their prejudicial effect would outweigh any probative value they might have. The court heard and denied the motion, finding that the evidence was probative as to the sequence of events leading up to Patterson's arrest. The judge told defendant he could raise his objection to the evidence again at trial if he so wished.
During his trial testimony, Corporal Joseph stated that he pulled Patterson over on a traffic stop. The officer found defendant did not have a driver's license. When Joseph looked through one of the car's windows, he spotted a gun on the floorboard. That weapon was identified by the officer at trial and was admitted as evidence. Joseph further stated:

*109 Once the weapon was observed Mr. Patterson was arrested. The passenger of the vehicle also did not have a driver's license on him so we elected to tow the vehicle. I entered the vehicle to recover the weapon and upon entering the vehicle from the driver's side door area, I observed two additional weapons tucked between the armrest on the front seat.
The officer found that one of those two guns was listed as having been stolen from Hardell Mack. It was established that the two guns in the armrest would have been within the immediate reach of the driver, Patterson. After some further testimony from Joseph, Patterson's attorney objected (out of the jury's hearing) to any additional mention of guns other than the one belonging to Mr. Mack. The judge sustained the objection and there was no further testimony concerning the two guns.
Generally, evidence of other crimes or bad acts is inadmissible at trial. However, when evidence of such acts tends to prove a material fact and has independent relevance other than to show that the defendant is of bad character, it may be admitted under certain statutory or jurisprudential exceptions to the exclusionary rule. La. C.E. art. 404(B)(1); State v. Jackson, 625 So.2d 146 (La.1993). Such an exception is made for evidence which pertains to an integral part of the event.
The res gestae doctrine was codified in La. C.E. art. 404(B)(1), which provides that other crimes evidence is admissible "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding." The res gestae doctrine is broad, and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evidenced under the circumstances. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, 876, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).
In the instant case, defendant did not make a timely objection to the disputed testimony. In fact, counsel allowed the prosecutor to ask several questions about the first gun the officer spotted and to offer the gun for identification. He did not object until some time later.
The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. La. C.Cr.P. art. 841; State v. Rochon, 98-717 (La.App. 5 Cir. 3/10/99), 733 So.2d 624. Despite the fact that the trial court sustained his objection, defendant failed to move for the applicable remedy.
Under La.C.Cr.P. art. 770, a prescribed remedy for an improper reference to other crimes evidence made by the judge, prosecutor, or a court official is a mistrial. As a general rule, Article 770 does not apply to testimony by a state witness, as a witness is not considered a "court official" for purposes of the article. However, the jurisprudence provides that an impermissible reference to another crime deliberately elicited by the prosecutor would be imputable to the State and would therefore trigger the provisions of Article 770. See State v. Girod, 96-660 (La.App. 5 Cir. 11/25/97), 703 So.2d 771, writ denied, 98-0244 (La.6/19/98), 719 So.2d 480. The article also provides that a defendant may move the court to simply admonish the jury to disregard the objectionable comment.
Official Revision Comment (b) to Article 770 provides, "A failure to move for a mistrial is a waiver of the error, since this article requires a motion by the defendant." It seems, then, that defendant waived the error. Moreover, defendant's *110 argument, if addressed on its merits, has little substance.
Although the first gun the officer described seeing was not the one belonging to Mr. Mack, the testimony was relevant to show how the officer came to arrest defendant and then to find Mack's gun. That gun was not mentioned to paint defendant as a "bad person," but rather to show why the officer took the actions he did. We find that the testimony at issue was permissible as res gestae, given the broad definitions which have been applied to that exception.
Finally, it can be said that the testimony as to the two guns was not "other crimes" evidence at all. The exclusionary rule applies to references to other crimes committed or alleged to have been committed by the defendant. Possessing a gun is not in and of itself illegal. The sentencing record in this case shows that Patterson was a convicted felon, and it was therefore a felony offense for him to possess a weapon. However, that information was not presented to the jury.
The erroneous admission of other crimes evidence is subject to harmless error review. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, reconsideration denied, 94-1379 (La.4/8/96), 671 So.2d 332. Harmless error exists where the guilty verdict actually rendered was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Defendant argues that the admission of the evidence as to the two additional guns caused him irreparable harm. Assuming, arguendo, that the guns were admitted in error, it cannot be said that the guilty verdicts were attributable to such error.
We find no merit to these assignments.
ASSIGNMENT OF ERROR NO. 7
The trial judge erred in failing to grant a mistrial when Hardell Mack intimated that Deaudre Hester implicated Jimmie Patterson in Hester's telephone calls to Mack following his arrest and the witness had been warned prior to the [sic] testifying to avoid such a reference in the joint trial.
[Patterson]
Patterson complains that, in testifying about his telephone conversations with Deaudre Hester, Hardell Mack improperly alluded to references Hester made to him. Defendant asserts that such references constituted inadmissible hearsay and violated his right of confrontation. He argues he is entitled to a new trial.
When Hardell Mack took the stand, the following colloquy took place out of the jury's hearing:
Mr. Austin [prosecutor]:
I want to make sure that Ms. Wiggins [Hester's counsel] is aware of the ruling that she's not to ask any questions that would elicit an answer where he would have to mention Jimmie Patterson's name. I don't want to get in a situation where the defense counsel has asked a question on cross and then the state is penalized by way of some mistrial or at least something else.
The Court:
Everybody understands that particular ruling when you talk to him?
Mr. Austin:
And he understands not to mention Mr. Patterson's name.
Mr. Sudderth [Patterson's counsel]:
Or "they" or "we" or anything. It's more than just Mr. Patterson.
The Court:
Say again.
Mr. Sudderth:
I also don't want him to testify to anything about "they" or "we"; he told us we did this, we did that because that implies and therefore is an implication.
The Court:

*111 Did you instruct him?
Mr. Austin:
I have, but I'll instruct him again. Do you want me to take him outside?
The trial court thereafter instructed Mr. Mack as follows:
The Court:
Mr. Mack, the Court has made certain rulings, sir. The record should now reflect that this is outside the presence of the jury. For reasons discussed at side bar, the Court instructs the witness that I have made certain rulings with respects [sic] to the conversation that you testified to previously that you had with Mr. Hester and that ruling is that you will not give testimony which would tend to suggest that Mr. Patterson, that Mr. Hester told you anything about Mr. Patterson. Do you understand that?
The Witness:
Yes, sir.
The Court:
Furthermore, during the course of your testimony that he, Mr. Hester, said words such as "we did that" which would seem to indicate that he was talking about persons other than himself. Do you understand that?
The Witness:
Yes, sir.
During the course of direct examination by the State, Mack testified that he had received a number of telephone calls from Deaudre Hester after Hester's arrest. These were "three-way" calls that Hester placed through a woman named Tanika. During those conversations, Hester told Mack he was not involved in the abduction and rape. He promised Mack he would arrange for him to get his wife's stolen wedding ring back in exchange for Mack's agreement not to testify against him. Mack agreed and Hester set up a meeting between Mack and an attorney named Mike Milton. Mack testified that he retrieved the wedding ring from Milton.
Patterson complains of the following testimony by Mr. Mack:
By Mr. Austin:
What did Mr. Hester tell you as it related to Mr. Milton?
A: Well, he was telling me that he was going to have Mr. Milton to contact me about the thing about the ring and first he wanted to know before he gave me the ring back with insurance that he would have as far as me coming to court.
Q: And what did you tell him?
A: I told him I wouldn't come to court if that was my wife's ring and if he told me about the other party.
At that point Patterson's counsel objected (out of the jury's hearing) to Mr. Mack's reference to the "other party." Hester's attorney moved for a mistrial. The court denied the motion. The prosecutor argued that he believed the "other party" the witness referred to was actually Mr. Milton, but that he was not sure of this. The judge determined that the reference made by Mack was vague and was not sufficient to create an inference in the minds of the jurors that the other party was Patterson. The judge instructed the jury to disregard the statement.
Defendant argues that the Mack's reference to the "other party" was inadmissible under the holding in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In that case, the United States Supreme Court reversed the robbery conviction of a defendant who had been implicated in the crime by his codefendant's confession. The Bruton court held that because the co-defendant did not take the stand at the joint trial and thus could not be cross-examined, the admission of his confession violated the defendant's rights under the Sixth Amendment's Confrontation Clause. However, the disputed statement in this case was not of the type contemplated by Bruton.
First, the statement was made by Mr. Mack, not by Patterson's co-defendant. *112 Moreover, the statement was not inculpatory as to Patterson. His name was not mentioned and there is nothing in the testimony to indicate that Patterson was the "other party" to whom Mack referred. Moreover, Mack testified that Hester himself denied any involvement in the kidnapping. It does not appear that the testimony at issue could have prejudiced Patterson's case.
Defendant complains that the court's admonition was itself prejudicial, as it called the jurors' attention to the statement. However, the transcript shows that the judge's admonition was brief and that he made no specific reference to Patterson. Based on the foregoing, we find no merit to this assignment.
ASSIGNMENTS OF ERROR NOS. 8 AND 9
The trial judge erred in placing the burden of proof on the defense at the Motion to Quash based upon improper venue.
[Hester]
The trial judge erred in concluding that the venue for the rape and aggravated crime against nature prosecution was properly in Jefferson Parish where all the elements of the offense occurred in Orleans Parish.
[Hester]
By these assignments, Hester argues that because the rape and aggravated crime against nature offenses (counts 3 and 4) were alleged to have occurred in Orleans Parish, they should not have been tried in Jefferson Parish.
On August 7, 1998, Hester filed a Motion to Quash, alleging improper venue as to those counts. The motion was scheduled for hearing on August 13, 1998. On that date, Hester's attorney asked the court to take judicial notice that the London Lodge Motel was within the boundaries of Orleans Parish. The judge responded that he would not do so. The court held the hearing open so as to allow Hester's attorney an opportunity to supplement her motion.
The motion hearing continued on September 9, 1998, at which time Patterson's attorney offered the following stipulation:
The stipulation, Your Honor, is that if the defense put on a witness regarding the motion to quash regarding the distance between thewhere the elements of the crime of rape occurred where London Lodge Motel is and where the parish line is a distance of 1100 feet.
The London Lodge Motel is 1100 feet inside of Orleans Parish from the line that separates the Parish of Jefferson and the Parish of Orleans.
Hester's attorney and the prosecutor agreed to the stipulation and the court accepted it.
Based on the stipulation and the subsequent arguments of counsel, the trial judge denied the motion. Hester's writ application was denied. State v. Hester, 98-995 (La.App. 5 Cir. 9/16/98). This Court reasoned:
The record indicates that the aggravated rape was a continuing criminal action to the armed robbery and aggravated kidnaping, both of which occurred in Jefferson Parish. Accordingly, venue in Jefferson Parish is proper. Relator's request for relief is denied. See La. Code Crim. P. art. 611 and State v. Roblow, 623 So.2d 51 (La.App. 1st Cir. 1993).
La.C.Cr.P. art. 611 provides:
All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred.
La.C.Cr.P. art. 615 provides:
Improper venue shall be raised in advance of trial by motion to quash, and *113 shall be tried by the judge alone. Venue shall not be considered an essential element to be proven by the state at trial, rather it shall be a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial.
Defendant argues that the State did not meet its burden of proving by a preponderance of the evidence that elements of the aggravated crime against nature and aggravated rape occurred in Jefferson Parish. Defendant points out that the State did little more at the motion hearing than to agree to the stipulation offered by the defense. In reviewing these assignments, however, we are not limited to the evidence adduced at the hearing on the motion to quash.
In State v. Roblow, 623 So.2d at 55, the First Circuit found that the reviewing court may consider evidence from both the motion hearing and trial in determining whether venue was proper. The Roblow court drew an analogy to the review of a trial court's ruling on a motion to suppress, where jurisprudence dictates that the appellate court may look at both trial and motion hearing testimony.[3]
It must be determined whether the State sufficiently proved, pursuant to Article 611, that elements of the aggravated crime against nature and aggravated rape occurred in Jefferson Parish. In Roblow, the defendant carjacked two sisters at gunpoint in East Baton Rouge Parish and ordered them to drive him to Shreveport. He threatened to kill them if they did not cooperate. The three traveled to Shreveport, with one of the sisters at the wheel. About one hour outside of Bossier City, the defendant began to fondle one of the sisters under her skirt and told the victims they were pretty. He also told them that he felt women had always mistreated him.
Once in Bossier City, the defendant had the women stop at a motel. Once inside the motel room, the defendant ordered the victims to undress, again threatening them with his gun. The defendant then fondled the women and forced them to have sexual intercourse with him. Afterwards, the defendant ordered the sisters to drive him to Shreveport. The defendant was indicted in East Baton Rouge Parish on two counts of aggravated kidnapping, two counts of aggravated rape, and one count of armed robbery.
The trial court granted the defendant's motion to quash the aggravated rape charges. On appeal, the State challenged the trial court's ruling. The reviewing court found that the trial court had erred in granting the motion to quash as to the rape charges. The court reasoned:
The elements of "threats" and being "armed with a dangerous weapon" were present from the outset in Baton Rouge and were relevant when the victims later were "prevented from resisting" the rapes in Bossier City. Thus, we find that an "act or element" of the aggravated rapes occurred in East Baton Rouge Parish. See La.Code of Crim.P. art. 611, comments (b) & (d).
623 So.2d at 56.
In the instant case, the evidence showed that the perpetrators all threatened Ms. Mack with bodily harm from the outset of the kidnapping in Jefferson Parish. The threats continued even after defendants took Ms. Mack to the motel in Orleans Parish. It is therefore arguable that an element of the aggravated rape (that the victim is "prevented from resisting by threats of great and immediate bodily harm") did occur in Orleans Parish. La. R.S. 14:42(A)(2). Similarly, an element of aggravated crime against nature (that the victim is "prevented from resisting the act *114 by threats of great and immediate bodily harm accompanied by apparent power of execution") was begun in Jefferson Parish and continued at the motel. La. R.S. 14:89.1(A)(2).
Assuming that an element of each of these offenses was committed in Jefferson Parish, Jefferson Parish was a proper venue in which to try them. Accordingly, the trial court did not err in denying Hester's motion to quash Counts 3 and 4 of the indictment.
Finally, our review shows no patent errors which require either reversal or correction. For the foregoing reasons, therefore, the defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The record indicates that Alex Henderson also was indicted for aggravated kidnaping and armed robbery, but he was still at large at the time of the proceedings.
[2] Although counsel indicates by her initial listing of assignments that both Patterson and Hester join in raising Assignments of Error Numbers 3 and 4, she alleges in her conclusion to this argument that only Patterson was prejudiced by hearsay testimony alleged in Assignment No. 3 and that only Hester was prejudiced by the hearsay alleged in Assignment No. 4.
[3] See State v. Calloway, 97-796, p. 6 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, 565, writs denied, 98-2435 (La.1/8/99), 734 So.2d 1229, 98-2438 (La.1/8/99), 734 So.2d 1229, in which this court held that, in determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion to suppress, but may also consider pertinent evidence given at the trial.